**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Mark A. CHEVALIER, Defendant–Appellant.**

**No. 92–1598.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 23, 1993.

Decided Aug. 3, 1993.

Mel Johnson (argued), Stephen J. Liccione, Asst. U.S. Atty., Office of the U.S. Atty., Milwaukee, WI, for plaintiff-appellee.

Marna M. Tess–Mattner, Franklyn M. Gimbel, Kathryn A. Keppel, Raymond M. Dall'Osto (argued), Gimbel, Reilly, Guerin & Brown, Milwaukee, WI, for defendant-appellant.

Before POSNER and MANION, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

MANION, Circuit Judge.

On June 11, 1991, a federal grand jury returned a superseding indictment against Mark A. Chevalier alleging three counts of tax fraud, 26 U.S.C. § 7206(1), and two counts of making false statements in connection with loan extensions, 18 U.S.C. § 1014. On November 1, 1991, the district court granted Chevalier's motion to sever the tax and bank fraud counts. At the close of trial, the jury convicted Chevalier of the three tax fraud counts. He later pleaded guilty to one count of bank fraud, and by agreement the other count was dismissed. On appeal he challenges the scope of the government's cross-examination after he took the witness stand at the tax trial and the district court's computation of his sentence for bank fraud. We affirm Chevalier's conviction, but vacate his sentence and remand to the district court for resentencing.

## I. Background

### A. Tax Fraud.

Chevalier operated a business in Wisconsin that sold heavy construction equipment. This began as an adjunct operation with his father's automobile dealership, and by 1982 Chevalier was on his own. Gross receipts and sales totaled between one and two million dollars. He alone kept the books and records of his business, and he filed the necessary income tax forms. What started out as a profitable business, however, eventually evolved into desparate schemes to stay afloat.

Beginning with his 1984 tax return, Chevalier underreported his gross receipts and sales by $279,000; in 1985, $83,000; in 1986, $23,000. For example, from 1984 to 1986 Chevalier failed to report the sales of parts and tires, and only portions of customer trade-ins. Although he collected sales tax from customers, Wisconsin never received the money. This led to Chevalier's indictment on three counts of tax fraud, 26 U.S.C. § 7206(1).

### B. Bank Fraud.

Stephenson National Bank financed a significant amount of the operation. It was a simple security arrangement. Chevalier would borrow money and pledge his inventory as collateral. However, Chevalier lied to the bank on several occasions in order to obtain loan renewals. On August 30, 1988 Chevalier had borrowed $100,000 to finance

the purchases of three pieces of construction equipment. He sold that equipment on September 30, 1988, but the loan was not paid off. During the bank's on-site inventory inspections, Chevalier would point out various pieces of other equipment on the lot that matched the description of the pledged inventory; however, the bank employee did not check serial numbers. If similar equipment was not in the yard, Chevalier would tell the bank employee that the equipment was being repaired. On February 27, 1989 Chevalier renewed the note for $65,000, again pledging the previously sold equipment as collateral. He likewise renewed the note again in May, August and November. In the end, the bank wrote off the $65,000 loss. This led to Chevalier's indictment on Counts four and five of making false statements in connection with loan extensions, 18 U.S.C. § 1014.

The district court severed the tax and bank fraud counts, trying the tax fraud counts first. The jury convicted Chevalier as charged. He thereafter pleaded guilty to the bank fraud as alleged in Count four; Count five was dismissed as part of the plea agreement.[1]

## II. Cross-examination

At trial on the tax fraud, Chevalier admitted that he filed false tax returns subject to the penalties of perjury. Tax fraud, however, requires an element of intent. The sole issue for the jury was whether Chevalier willfully signed the tax returns believing that they were not correct. Chevalier took the stand as his only defense witness. During cross-examination the district court allowed the government to question Chevalier about the facts surrounding the alleged bank fraud counts, which had been severed for a later trial.

■ Chevalier vigorously objected, arguing that the bank fraud counts were irrelevant to the government's proof of tax fraud, and that the bank fraud counts involved alleged conduct that occurred three years after the end of the 1986 tax year. In Chevalier's view the government was attempting to convince the jury that if Chevalier lied to the

bank in 1989, he probably lied to the Internal Revenue Service ("IRS") from 1984 to 1986. In support of this argument, Chevalier relied on Fed.R.Evid. 404(b):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, . . . .

The government on the other hand relied on Fed.R.Evid. 608(b):

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, . . . may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, . . . .

We review the introduction of such evidence under the abuse of discretion standard. *United States v. Wilson*, 985 F.2d 348, 351 (7th Cir.1993).

■ The question at the tax trial was whether Chevalier lied to the IRS on his 1984–1986 tax returns. Granted, if Chevalier had not taken the witness stand, the government could not have introduced evidence of the alleged bank fraud without facing Rule 404(b). The government could not have attempted to show that because Chevalier committed bank fraud, he likely would have committed tax fraud as well. But by electing to testify, Chevalier placed his credibility in issue. *United States v. Covelli*, 738 F.2d 847, 856 (7th Cir.), *cert. denied*, 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984). Thus, the government could introduce evidence relevant to whether Chevalier was testifying truthfully, pursuant to Rule 404(b) (evidence of other crimes admissible for other purposes) and Rule 608(b)(1) (if probative of truthfulness). *Wilson*, 985 F.2d at 351–52 (bribery, perjury and the defendant's failure

---

1. Count five involved an alleged misrepresentation to the bank on May 8, 1990 involving a $70,000 loan. Again, the collateral securing the loan had been previously sold.

to file income tax returns are acts of dishonesty within the scope of cross-examination under Rule 608(b)); *United States v. Fulk*, 816 F.2d 1202, 1206 (7th Cir.1987) (under Rule 608(b) the court should have allowed the government to impeach the defendant regarding whether his chiropractor's license had been suspended for deceptive practices); *United States v. Howard*, 774 F.2d 838, 844–45 (7th Cir.1985) (Rule 608(b) allowed the government to question the defendant as to whether he had lied on employment applications).

Chevalier does not deny that submitting false statements to obtain loan extensions constitutes specific instances of conduct probative of truthfulness. He also admits that a defendant who takes the stand may be impeached with prior instances of misconduct, citing *Covelli*, 738 F.2d at 856, and a plethora of cases from other circuits. *United States v. Sperling*, 726 F.2d 69 (2d Cir.), *cert. denied*, 467 U.S. 1243, 104 S.Ct. 3516, 82 L.Ed.2d 824 (1984); *United States v. Mansaw*, 714 F.2d 785 (8th Cir.), *cert. denied*, 464 U.S. 964, 104 S.Ct. 403, 78 L.Ed.2d 343 (1983); *United States v. Cole*, 617 F.2d 151 (5th Cir.1980), *cert. denied*, 452 U.S. 918, 101 S.Ct. 3055, 69 L.Ed.2d 422 (1981); and *United States v. Reid*, 634 F.2d 469 (9th Cir. 1980). Yet he insists that the rule allowing impeachment with *prior* instances of misconduct does not allow evidence of bank fraud that occurred *after* the tax fraud. We reject such syllogism. Rule 608(b) allows specific instances of misconduct *prior* to Chevalier taking the witness stand, not prior to the crime in which he is charged. *See McCormick on Evidence*, p. 102 (3d ed. 1984). Thus, the government's cross-examination was proper.[2] Chevalier's convictions for tax fraud are AFFIRMED.

## III. Sentencing

The court sentenced Chevalier to concurrent sentences of twelve months on the three tax fraud counts, which were not under the sentencing guidelines. He does not appeal this decision. As to his conviction for bank fraud pursuant to the guilty plea, the court ordered a presentence report and thereafter sentenced him to twelve months and one day under the sentencing guidelines. Chevalier appeals the court's upward adjustment of his base offense level because of the amount involved in the bank fraud. He also appeals the court's refusal to adjust downward because of his acceptance of responsibility. We address each in turn.

### A. *Amount of Fraud.*

On August 30, 1988 Chevalier had borrowed $100,000 to finance the purchases of three pieces of construction equipment. That equipment was sold on September 30, 1988. In the next six months, Chevalier had paid off approximately $35,000 of principal. Thus, on February 27, 1989 he renewed the note for $65,000, again pledging the previously sold equipment as collateral. This note was renewed for the same amount in May, August and November of 1989. In March, 1990, the bank consolidated a number (but not all) of Chevalier's loans, including the $65,000 note that formed the basis of the bank fraud count. After the loan consolidation no separate records were kept on the $65,000 note. The consolidated loan amount totalled $1,065,966, principal and interest, and Chevalier had made payments of at least $297,900. He argues that the method of calculating the amount of loss attributed to the bank fraud count directly affects any

---

2. Chevalier also asserts in his brief that the district court allowed Exhibits 130 to 137 into evidence, which constitute extrinsic evidence in violation of Fed.R.Evid. 608(b). The record reflects the opposite. During cross-examination, the government sought to show that Chevalier made false statements to Stevenson National Bank. Exhibit 130 was a chattel security agreement dated August 30, 1988. The others were related to that agreement: exhibit 131, a business note; exhibits 132–135, renewals; and exhibit 136, an invoice. Exhibit 137 was not mentioned. Contrary to Chevalier's arguments, these exhibits

were not admitted into evidence; they were shown to him only after he could not remember signing them and to merely refresh his recollection. When questioning Chevalier on the bank fraud allegations, the government had to take his answer and not get into extrinsics. The record supports just that. Chevalier's arguments concerning the propriety of the government addressing the bank fraud during closing argument do not come close to the threshold of reversible error. *See Moylan v. The Meadow Club, Inc.*, 979 F.2d 1246, 1250 (7th Cir.1992).

increase in his base offense level. On appeal he asserts that the percent paid on the consolidated loan should be prorated against the $65,000, which would leave only $46,930 outstanding.

As the district court found under the Guidelines in effect at the time of sentencing, if Chevalier cheated the bank out of more than $50,000 (but less than $100,000), his Guideline range would be increased five levels, thereby resulting in an eight to fourteen month sentence. Less than $50,000 would result in a sentence of six to twelve months and allow the possibility of intermittent local confinement on work release. Thus Chevalier obviously wants the ceiling kept below $50,000. To show how the $65,000 loan should be lowered for sentencing purposes, Chevalier relies on payments he made to the bank, both prior to the indictment and sentencing dates.[3]

■ We review the district court's determination of the amount of loss for clear error as a finding of fact. "However, the meaning of 'loss' in § 2F1.1(b)(1) is a 'legal question on which our review is plenary.'" *United States v. Strozier*, 981 F.2d 281, 283 (7th Cir.1992) (citing *United States v. Mount*, 966 F.2d 262, 265 (7th Cir.1992)).

In pertinent part, the district court made the following findings regarding the payments Chevalier had paid on the consolidated loan in calculating the amount of loss in this case:

Without some specific designation as to what payments if any were made on the $65,000 obligation, I find it difficult to apply the percentage that has been suggested here by defense counsel of 27.8 percent of payments made. It does appear to the court that when no designation is made[,] the bank then, being the recipient of those payments, can apply those obligations on the revolving credit, and in doing so *it would appear that the indebtedness represented by the revolving credit has to some extent been reduced.* ¶ Under those circumstances the court feels that the amount for consideration here on this charge should be $65,000, and the additional increase in the level of five would be appropriate as shown in the presentence report. [Emphasis added.]

Thus, the court found that the consolidated loan amount was reduced; however, the court did not make any findings regarding how the specific loan which was a part of that consolidation was somehow affected.

For determining the pertinent offense level, the parties do not dispute that U.S.S.G. § 2F1.1 applies to this case. *See United States v. Rothberg*, 954 F.2d 217, 218–19 (4th Cir.1992); *United States v. Johnson*, 908 F.2d 396, 398 (8th Cir.1990). In calculating the amount of fraud, the district court was required to find

the amount of money the victim has actually lost (estimated at the time of sentencing), not the potential loss as measured at

---

3. The superseding indictment and the plea agreement show that Chevalier committed bank fraud on February 27, 1989 when he renewed the $65,000 note. Chevalier was sentenced on February 27, 1992. As a general rule, courts apply the Guidelines in effect at the time of sentencing. *United States v. Willey*, 985 F.2d 1342, 1350 (7th Cir.1993); *cf. United States v. Schnell*, 982 F.2d 216, 218–19 (7th Cir.1992). But if the current Guidelines result in stiffer penalties, the courts must apply the earlier version in effect when the crime was committed. *See Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987). So Chevalier has a choice between the February 1989 version or the current one. The current version of U.S.S.G. § 2F1.1 indicates that a loss of more than *forty* thousand dollars, not fifty, calls for a five-level increase. U.S.S.G. § 2F1.1(b)(1)(F). So it is unlikely that he would chose the latest version. In any event, the Guidelines now give very specific commentary

on determining the amount of loss in cases involving fraudulent loan applications.

In fraudulent loan application cases and contract procurement cases where the defendant's capabilities are fraudulently represented, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered, or can expect to recover, from any assets pledged to secure the loan.

U.S.S.G. § 2F1.1, comment. (n. 7(b)). The court can also consider the risk of loss Chevalier created for the bank. *Id.* In this case the district court neither found with respect to the amount Chevalier had paid the bank by the time his fraud was discovered, nor how much the bank lost (actual or expected) or was at risk of losing.

the time of the crime. However, the "loss" should be revised upward to the loss that the defendant intended to inflict, if that amount is higher than the actual loss.

*United States v. Kopp*, 951 F.2d 521, 536 (3d Cir.1991), citing with approval *United States v. Schneider*, 930 F.2d 555, 558–59 (7th Cir. 1991). The record does not show from what date the district court was measuring the amount of loss. When the crime was discovered? at indictment? at sentencing? If measured prior to sentencing, perhaps Chevalier received too harsh a sentence. This is not to say that the court must search for mathematical certainty, *United States v. Haddon*, 927 F.2d 942, 951 (7th Cir.1991), or devise special accounting rules in cases involving consolidated loans. *See* U.S.S.G. § 2F1.1, comment. (n. 8) ("The amount of loss need not be precise.... The court need only make a reasonable estimate of the range of loss, given the available information.").

■ Nevertheless, proper findings are particularly necessary in this case. The government indicted Chevalier for bank fraud involving a $65,000 loan. Yet he had loans with the bank totalling over one million dollars. Prior to indictment, the bank consolidated most of the outstanding loans, including the $65,000, and stopped maintaining separate records. Eventually the bank wrote off the entire $65,000 as a loss. Also, the parties do not dispute that Chevalier at some time paid a considerable amount off on the consolidated loan. The government wants to give him no credit at all, considering that the bank lost much more than $65,000 on the consolidated amount. But the government, in turn, has made no showing that Chevalier defrauded the bank on anything other than the $65,000. To the contrary, throughout this case the government has stipulated that the bank lost no more than $65,000 due to fraud. This implies that the other loans were legitimate, although in hindsight not prudent. In any event, in order to increase Chevalier's sentence, the government must prove the actual loss involved in this case. *United States v. Smith*, 951 F.2d 1164, 1167 & n. 5 (10th Cir.1991).

Chevalier, in turn, argued initially to the district court that after consolidation, the $65,000 note was paid off in full. He later softened his stance and argued that the $297,000 he paid on the total amount owed of $1,065,966 (a 27.8 percent payment) should be prorated against the $65,000 note, resulting in a loss to the bank of $46,930. For the first time on appeal, Chevalier asserts that he also turned over to the bank $223,900 worth of equipment (for a total of $521,800).

Neither approach gives us sufficient facts for review. *See United States v. Whitehead*, 912 F.2d 448, 451–52 (10th Cir.1990) (the court applied a *de novo* review and held that in determining the amount of loss, the value of an option to purchase a home does not equate with the value of the home). Without a more precise calculation of the amount of loss and the designation of a specific time when the loss was measured, we are not able to determine whether the government has met its burden. *United States v. Jackson*, 983 F.2d 757, 771 (7th Cir.1993).

For example, suppose Chevalier had defrauded the bank on a $100,000 loan and also obtained a legitimate loan for $500,000. The former was secured by inventory that Chevalier had previously sold (thus, the fraud as in this case); the latter was secured by inventory at the store. As the business crumbles, if Chevalier turned over to the bank his inventory securing the $500,000 loan, surely he cannot be heard to argue that any portion of that amount should be prorated against the amount the bank lost on the fraudulent, unsecured loan. In contrast, if Chevalier paid the bank from profits received on unsecured inventory, such profits could be applied to the amount the bank lost as a result of fraud. The calculation becomes difficult where the loans are consolidated and the security agreements do not specify which inventory secures which notes. To accommodate judicial review, the district court will need to set out precise calculations in order to enhance Chevalier's sentence.

We remand for just such a hearing. The district court should entertain evidence on the nature of Chevalier's relationship with the bank, in particular the timing and terms of the consolidated loan agreement, the usual accounting practices the bank uses in reducing consolidated loans (e.g., how would the

bank have applied Chevalier's payments to the $65,000 note if it was not the result of fraud?), and include in its calculations all payments made by Chevalier *by the time of sentencing.* The court may also add such losses as Chevalier intended to inflict, if that amount is higher than the actual loss. *See Strozier,* 981 F.2d at 284.

## B. *Acceptance of Responsibility.*

After the jury convicted him of tax fraud, Chevalier pleaded guilty to one count of bank fraud. He asserts that as part of the plea, the government agreed to recommend a two point downward adjustment for acceptance of responsibility. The presentence report so recommended. By the time of the sentencing hearing, however, the government had changed its posture. The district court refused to reduce the offense level and Chevalier appeals.

■ The Sentencing Guidelines provide the district court with an opportunity to decrease the offense level by up to two points where "the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." U.S.S.G. § 3E1.1(a). This determination involves questions of fact, *United States v. McKenzie,* 922 F.2d 1323, 1329 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 163, 116 L.Ed.2d 127 (1991), entitled to "great deference and will not be disturbed unless ... without foundation." *United States v. McGuire,* 957 F.2d 310, 317 (7th Cir.1992); *see* U.S.S.G. § 3E1.1, comment. (n. 5). We review the district court's findings of fact for clear error. *United States v. Tolson,* 988 F.2d 1494, 1497 (7th Cir.1993); *United States v. Skinner,* 986 F.2d 1091, 1093 (7th Cir.1993).

■ In the plea agreement, the United States was "to recommend a two level decrease for acceptance of responsibility as authorized by § 3E1.1 of the Sentencing Guidelines Manual, but only if the defendant exhibits conduct consistent with the acceptance of responsibility." This language is conditional.

In essence, the plea agreement left open the ultimate question the district court had to decide: the degree to which the defendant accepted responsibility for his criminal conduct.[4] So we will move directly to the pertinent evidence submitted at sentencing.

At Chevalier's tax trial, he testified on redirect examination that on some occasions bank officials would have him sign blank loan renewal forms, which were later completed and mailed back. Although the district court did not make a specific finding on this issue, the government argues that this testimony exhibited an attempt by Chevalier to negate the necessary intent involved in bank fraud. The testimony does not demand such an interpretation. Chevalier testified that *some* blank forms were signed. He never specified whether this included the documents involved in the bank fraud. It is important that the district court make a finding on this testimony and its reliance on this testimony when declining to reduce the offense level. Chevalier pleaded guilty to bank fraud *after* the tax fraud case was over. If Chevalier's testimony reflected non-acceptance of responsibility, as the government now insists, why would the government enter a plea agreement containing even a conditional recommendation otherwise? The district court still could have made a determination that Chevalier's testimony reflected non-acceptance of responsibility. But without such reflection in the record, we cannot solely rely on the government's present spin.

The initial presentence report recommended no downward adjustment for acceptance of responsibility. Apparently, in his interview, Chevalier was less than forthright with the author of the presentence report. Chevalier thereafter wrote a letter of remorse to the report's author, who then changed his recommendation. The district court noted that it was primarily concerned about the timeliness of Chevalier's asserted acceptance of responsibility. The court found that Chevalier did not manifest responsibility until the "11th hour," after the tax and bank fraud counts were bifurcated and

---

4. Chevalier has made no argument that the court failed to comply with Fed.R.Crim.P. 11. *See United States v. Price,* 988 F.2d 712, 718–19 (7th Cir.1993); *United States v. Bennett,* 990 F.2d 998, 1004 (7th Cir.1993).

the tax fraud set for trial. In essence the court heard the parties' separate arguments and concluded that Chevalier failed to "clearly demonstrate recognition and affirmative acceptance of responsibility," tracking the language of U.S.S.G. § 3E1.1(a).

Chevalier does not challenge the district court's findings with regard to the timeliness of his actions. Rather, he argues that the district court erred in not considering the amount of money that he paid to the bank on the consolidated loan. The rule is not in dispute. The district court can consider Chevalier's "voluntary payment of restitution prior to the adjudication of guilt." U.S.S.G. § 3E1.1, comment. (n. 1(c)). The government responds that Chevalier's consolidated loan payments cannot qualify as restitution under section 3E1.1, because they were made as part of a continuing business obligation that transcended the fraudulent loan at issue. By finding that Chevalier's payments on the consolidated loan did not qualify to reduce the amount the bank lost as a result of the fraud, the court did not thereafter address whether Chevalier's payments on the consolidated note qualified as evidence that he had accepted responsibility for the bank fraud.

In *United States v. Escobar–Mejia,* 915 F.2d 1152 (7th Cir.1990), we remanded a case for resentencing where the district court had refused to consider whether the defendant had accepted responsibility because he had not provided substantial assistance to the government. The district court had apparently confused acceptance of responsibility and substantial assistance to the government by merging the two standards into a single reason to reduce the defendant's sentence. The Sentencing Guidelines, however, allow for either or both to contribute toward a reduced sentence. *Id.* at 1153. A similar possibility of confusion exists in this case.

In determining whether a defendant is entitled to a two point reduction for acceptance of responsibility, the district court can consider his "voluntary payment of restitution prior to adjudication of guilt." U.S.S.G. § 3E1.1, comment. (n. 1(c)). But in focusing on whether Chevalier accepted responsibility, the court made no findings with respect to the amounts Chevalier paid on the consoli-

dated loan prior to adjudication of guilt. And we cannot say that the district court could have otherwise considered the issue because the record does not show that the court properly applied Chevalier's payments when determining the amount of loss under section 2F1.1. Thus, we remand for the court to consider Chevalier's restitution prior to his adjudication of guilt, and whether such findings, together with all other evidence properly considered under section 3E1.1, should allow him a reduction for acceptance of responsibility.

Against this anticipated ruling the government argues that Chevalier's consolidated loan payments cannot qualify as restitution because they were made as part of a continuing business obligation. Not so. In *United States v. Carey,* 895 F.2d 318, 322–23 (7th Cir.1990), the defendant defrauded a bank by using a check kiting scheme, 18 U.S.C. § 1344. He had deposited checks totalling $220,000 in Bank One, knowing there were insufficient funds in Indiana National Bank to cover them. 895 F.2d at 320. By the time of sentencing the defendant had paid Bank One over $200,000. We found no error in the district court classifying this amount as restitution. In fact, we reversed the court's attempt to consider the defendant's payment as a reason to depart downward under section 2F1.1, and instructed the court to consider the defendant's payments under sections 3E1.1 or 5K2.0. 895 F.2d at 322–23.

In *United States v. Garlich,* 951 F.2d 161 (8th Cir.1991), the defendant car dealer had pledged the same vehicles as collateral for loans from two separate banks. Over a year before the indictment, the defendant paid the banks approximately $1.4 million; the banks lost $253,000. The Eighth Circuit approved the district court's two-level reduction for acceptance of responsibility because of the defendant's voluntary payments, *as restitution.* *Id.* at 163. The government in this case distinguishes *Garlich* by arguing that Chevalier entered into the consolidated loan only after learning of the government's general investigation. The timing of the restitution, however, is no reason to reject the reasoning in *Garlich* that payments made to a bank after fraudulently obtaining a loan

constitute restitution under section 3E1.1. As to the question of timing, application note 1(c) to that section specifically states that the court should consider "voluntary payment of restitution *prior to adjudication of guilt.*" (Emphasis added).[5]

We make no comment whether Chevalier has clearly demonstrated a recognition and affirmative acceptance of responsibility, deserving of a two level reduction in his offense level. We remand only to give the district court an opportunity to better determine this question consistent with the foregoing opinion.

### IV. Conclusion

The government's cross-examination was proper. Chevalier's conviction for tax fraud is therefore AFFIRMED. We REMAND to the district court for additional findings and for resentencing on the amount of the bank's loss and whether Chevalier accepted responsibility for bank fraud.

**5.** On appeal the government raises for the first time that Chevalier perpetrated the bank fraud by consolidating the $65,000 loan into the larger loan agreement. And that considering the consolidated loan, Chevalier's bank debt far exceeds the $65,000 loan involved in the count four plea agreement. At oral argument the government questioned whether interest on the $65,000 debt should be considered in calculating the effect of any loan payments. We decline to address these arguments not made to nor considered by the district court. *Textile Banking Co. v. Rentschler,* 657 F.2d 844, 853 (7th Cir.1981).