23 F.3d 411
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jerome P. CHERNOFF, Jose M. Hernandez, Alfred Bregantini,
also known as Fred Bregantini, Donald M. Jackson,
and Odalis Puig, also known as Odalis
Lorenzo, Defendants-Appellants.
 Nos. 92-2844, 92-3040, 92-3083, 92-3093, 92-3348.
 United States Court of Appeals, Seventh Circuit.
 Argued Sept. 15, 1993.
Decided April 19, 1994.
Rehearing Denied in No. 92-3040
June 2, 1994.
 
 Before CUDAHY, RIPPLE and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 The defendants, who participated in a scheme to fraudulently use telephone access codes and credit card account numbers, were convicted of conspiring to commit access device fraud and wire fraud. In addition, Chernoff and Bregantini were convicted of wire fraud, and Bregantini was convicted of conspiring to possess and distribute marijuana and of using a communication facility to facilitate marijuana distribution. Defendants now appeal their convictions and sentences. They raise a multiplicity of issues, all of which lack merit. We address their arguments in turn.
 
 I. Sufficiency of the Evidence
 
 2
 Chernoff, Jackson and Puig argue that the evidence was insufficient to support their convictions. The defendants bear a heavy burden in attempting to overturn their convictions on this basis. In reviewing the evidence, we must draw all reasonable inferences in the government's favor, and we will reverse only if no rational jury could have found the defendants guilty beyond a reasonable doubt. United States v. Gutierrez, 978 F.2d 1463, 1468 (7th Cir.1992); United States v. Curry, 977 F.2d 1042, 1053 (7th Cir.1992), cert. denied, 113 S.Ct. 1357 (1993). We will not reweigh the evidence or reevaluate the credibility of the witnesses. United States v. Van Wyhe, 965 F.2d 528, 531 (7th Cir.1992). Contrary to defendants' arguments here, then, the fact that inferences could have been drawn in the defendants' favor does not require a reversal of their convictions.
 
 
 3
 In order to prove the existence of a conspiracy, the government must establish that "1) the defendants agreed to accomplish an illegal objective; 2) the defendants performed at least one overt act in furtherance of the illegal objective; and 3) the conspirators intended to commit the substantive offense." United States v. Scarbrough, 990 F.2d 296, 299 (7th Cir.), cert. denied, 114 S.Ct. 121 (1993). Because conspiracies are secretive by their very nature, evidence of a formal agreement is not required. Id. Instead, "an agreement to conspire may be established by circumstantial evidence, including reasonable inferences drawn from the defendants' conduct and overt acts." Id. The intent element is satisfied by a showing that the defendant had the mental state that is required to establish the underlying offense. Id. at 301; United States v. Reiswitz, 941 F.2d 488, 495 (7th Cir.1991). The evidence linking the defendant to the conspiracy must be substantial. United States v. Durrive, 902 F.2d 1221, 1228 (7th Cir.1990).
 
 A. Chernoff
 
 4
 The government presented the following evidence regarding Chernoff. Between April and June of 1989, 76 telephone calls were made from Chernoff's home using an MCI telephone code that had been issued to a Nebraska organization named Gallop. On June 12, 1989, Chernoff, who was in New York City, spoke by telephone with Bregantini, who was in Wisconsin. Bregantini provided Chernoff with five additional Gallop codes, and the two discussed the use of the codes. There was no evidence suggesting that Bregantini told Chernoff that use of the codes was authorized. In addition, the individual who installed Gallop's telephone system testified that the organization had removed the telephone line at issue because it was being used by unauthorized parties. During the June 12 call, Bregantini and Chernoff also referred obliquely to the collection of credit card numbers.
 
 
 5
 When Chernoff was questioned by the Secret Service about his use of the telephone codes on November 5, 1987, he denied that he had made the calls from his home, suggesting that they had been made by others. When confronted with a tape recording of his June 1989 conversation with Bregantini, Chernoff stated that he did not recall the conversation because at the time of the call he was taking medication that caused memory loss.
 
 
 6
 That evidence is sufficient to support both the conspiracy and the wire fraud convictions. Chernoff argues that his conspiracy conviction should be reversed because the government failed to prove that the defendants actually committed the substantive offenses upon which the conspiracy charge was based. We need not address that argument, however, because such proof is not necessary to establish a conspiracy. As we explained in United States v. Townsend, 924 F.2d 1385, 1399 (7th Cir.1991), "the offense of conspiracy is complete at the time of agreement, whether or not its object is ever achieved."
 
 B. Jackson
 
 7
 The following evidence implicated Jackson in the conspiracy. During November 1988, Jackson did repair work on an apartment owned by his friend Jackie Jordan. On various days during that month, when Jackson had access to the apartment and Jordan was not at home, three deliveries of merchandise fraudulently obtained as part of the conspiracy were delivered to the apartment. At least one of the deliveries was of merchandise ordered from telephones (using unauthorized access codes) in Bregantini's clinic and Faries' cell block. There was also a note found in Faries' cell block indicating that at least some of the merchandise delivered to the apartment was for Bregantini. The merchandise was signed for in the name of "C. Wilson," "C. Willeaus," and "C. Williams." In addition, Jackson picked up a fraudulently obtained computer from a computer retailer on December 30, 1988, representing himself to be "P. Johnson." When interviewed by the secret service, Jackson denied ever having been to the computer store. Jackson was also linked to the pickup of several packages of illegally obtained merchandise from another apartment complex at the behest of Bregantini and Hernandez.
 
 
 8
 Sixteen telephone calls were placed from Bregantini's clinic to Jackson's daughter in Madison, Wisconsin. Jackson also used a credit card issued in the name of "Francis Brenan" (who had not applied for the card) to purchase items and obtain cash. In addition, various documents seized from Jackson's home and Faries' cell block linked Jackson to various addresses and credit card numbers used in the conspiracy. Jackson was also implicated by several intercepted phone conversations between himself and Bregantini or Faries. That evidence is clearly sufficient to support Jackson's conviction.
 
 C. Puig
 
 9
 Puig received several shipments from Faries of fraudulently obtained merchandise and she also received $200 that was wired to her via Western Union from Bregantini. Although she concedes these facts, she argues that she thought she was receiving gifts from Faries and did not knowingly participate in the conspiracy. Yet the evidence was sufficient to support the jury's inference that she did know that the merchandise was fraudulently obtained. In December 1988, Puig received cookies addressed to her son that included a note signed by "J.R.," which was the name of the person on whose credit card they had been ordered. In February 1989, she received a television, stereo and speakers that had been fraudulently obtained. The shipment contained an invoice indicating that the items had been purchased by Kenneth Noel, the person on whose credit card the items were purchased. The $200, which Puig claims to have thought came from Faries, was sent from Wisconsin (by Bregantini) even though Faries was incarcerated in Florida. Puig also received a camcorder and cigars from Faries, although she failed to advise the secret service of either of those items when she was interviewed. The evidence also linked Puig to the pick-up of various additional shipments to various addresses, and her name was frequently noted in connection with the shipment of merchandise in the papers that were recovered from Faries' cell.
 
 II. Special Verdict Form
 
 10
 Puig also argues that her conviction must be reversed because the district court did not provide the jury with a special verdict form that would have required special findings regarding each of the two charged goals of the conspiracy. She claims that, although the jury was instructed that they must agree unanimously as to the goals of the conspiracy, it is unclear that they did so without a special verdict form.
 
 
 11
 We addressed and rejected an identical argument in United States v. Sababu, 891 F.2d 1308 (7th Cir.1989). There we held that a special verdict form was not required, even though defendants were charged with a multi-goal conspiracy, when the district court had correctly instructed the jury regarding the unanimity requirement. Id. at 1325-26. Puig's argument likewise must fail. The jury was instructed that "[a]ll jurors, all jurors must agree as to which type of fraud the defendant was involved in and which type of fraud was the object of the conspiracy." (Tr. V. 32 at 25). No more than that was required.
 
 III. Hernandez
 A. Severance Motion
 
 12
 Prior to trial, Hernandez filed a severance motion on the ground that codefendant Bregantini's statements (made in the context of telephone conversations with co-conspirators Faries and Reyes) would be used against him even though Bregantini would be unavailable for cross examination. He claims that the district court wrongfully denied his severance motion and that the court violated Fed.R.Crim.P. 14 "in that it did not require the government to provide for in-camera inspection of all Fred Bregantini's statements which it intended to introduce at Mr. Hernandez's trial."
 
 
 13
 Both arguments lack merit. Taking the second argument first, Hernandez attached to his severance motion transcripts of three of the intercepted conversations. (Hernandez Record 28.) In response to Hernandez' motion, the government stated that it intended to introduce the same intercepted telephone conversations that it had introduced at the first trial, and it attached the transcripts of those conversations to its response. (Hernandez Record 30.) Thus, the government did exactly what Hernandez complains that it failed to do, and his objection is without foundation. As for the severance motion itself, Hernandez failed to renew his motion at the close of evidence, and has therefore waived the issue of severance on appeal. United States v. Cooper, 942 F.2d 1200, 1205 (7th Cir.1991), cert. denied, 112 S.Ct. 1303 (1992).[1]
 
 B. Motion to Dismiss Indictment
 
 14
 On December 12, 1990, the district court issued Hernandez' arrest warrant in this case. On April 30, 1991, he was arrested by the INS in the Western District of Texas for harboring three illegal aliens, and he was brought before a magistrate at that time. (See Hernandez Record 34.) He was released after 14 days in federal custody. The Wisconsin warrant was not executed until August 6, 1991. Hernandez moved the district court to dismiss his indictment on the grounds that the government's failure to execute the Wisconsin warrant while he was in custody in Texas violated his rights under Fed.R.Crim.P. 9(c)(1). He now appeals the district court's denial of that motion.
 
 
 15
 Hernandez' argument rests on this sentence from Rule 9(c)(1):
 
 
 16
 The officer executing the warrant shall bring the arrested person without unnecessary delay before the nearest available federal magistrate ... In particular, he complains that his rights were violated because he was not brought before a magistrate in the Wisconsin matter without unnecessary delay. But he misreads the rule. The unnecessary delay requirement applies only after the warrant has been executed. Although Hernandez was in custody in Texas, his Wisconsin warrant had not been executed at that time, so that the requirement that he be brought before a magistrate in the Wisconsin matter without unnecessary delay had not yet come into play.
 
 C. Handwriting Expert
 
 17
 Hernandez' next argument relates to the testimony of the government's handwriting expert. The expert compared the handwriting on three government exhibits with a handwriting exemplar attributed to Hernandez. Hernandez argued before the trial court that the exhibits and handwriting examplar were not "reasonably relied upon" by the expert, and that the expert's testimony therefore should have been excluded under Fed.R.Ev. 703.[2] Hernandez' argument rested on two theories. First, he argued that the expert could not have reasonably relied on the exhibits because they bore no identifying marks and the expert could not therefore have known their source.[3] (Tr. V. 27 at 4-6.) That argument is unpersuasive. There is no reason that the handwriting expert needed to know the source of the documents in order to determine whether they matched the exemplar. Indeed, such knowledge might bring factors other than the handwriting itself into his analysis, which would be potentially problematic. Hernandez also argued that "there was no reasonable reliance by the expert on those documents or those exemplars because the expert was a government employee and the documents were ... provided to him by the government." (Tr. V. 27 at 4; see also Tr. V. 26 at 189). But Hernandez failed, both below and on appeal, to articulate any explanation as to why the expert could not have reasonably relied on documents provided by the government merely because he also was employed by the government. If Hernandez' point is that the witness may not have been impartial,[4] he had every opportunity to bring that out on cross-examination. It does not form a basis for the exclusion of expert testimony under Fed.R.Ev. 703.
 
 D. Obstruction of Justice
 
 18
 Finally, Hernandez contests the district court's enhancement of his offense level by two points for obstruction of justice, pursuant to Sentencing Guidelines section 3C1.1, which was based on the court's determination that he had committed perjury during the trial. We review the district court's factual findings regarding an obstruction of justice for clear error. United States v. Pedigo, 12 F.3d 618, 628 (7th Cir.1993).
 
 
 19
 In United States v. Dunnigan, 113 S.Ct. 1111 (1993), the Supreme Court discussed the enhancement for obstruction based on a finding of perjury. The Court explained that a defendant commits perjury if, testifying under oath, "she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." Id. at 1116. The Court further explained that "if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out." Id. at 1117. In Dunnigan, the Court found that the district court's finding was amply supported by the fact that numerous witnesses had contradicted the defendant regarding many facts about which she could not have been mistaken. Id. In Pedigo, we similarly held that an enhancement was not clearly erroneous when the district court had found the defendant's testimony to be incredible when compared with that of other witnesses, and that finding was supported by the record. 12 F.3d at 629. We also have noted that when a district court's factual finding is based on a credibility determination, as is a finding that the defendant testified untruthfully, we "should be 'especially disinclined to conclude on the basis of a cold record that the court committed clear error.' " United States v. Hamm, 13 F.3d 1126, 1130 (7th Cir.1994).
 
 
 20
 Here, the court made the following findings:
 
 
 21
 The court ... has considered the testimony of Mr. Hernandez in the light most favorable to him, and I must conclude that there were many, many untruthful statements included in his testimony. In addition to those that have been mentioned, this talk about a 40 billion dollar loan and collateral for it and touting around not millions of dollars but billions of dollars and things of that nature were just so fantastic and related to matters that were either in the International Holding or the Hernandez Bonding Company as I recall one of the titles, and testimony that when he presented this to the bank they knew what he was talking about because they knew that there are a lot of people with just piles of gold there waiting to find a legitimate investment for them.
 
 
 22
 That sort of testimony is so fantastic that it's almost beyond perjury, it's almost something that would cause a person to wonder about the competence. But in addition to that the court had other testimony such as the explanation for the check of $1,050 given to I believe it was Mr. Jackson, first it was denied, then it was admitted but it was for the purpose of going out with some lady friend that he had and he didn't want his wife to know about it and some kind of a story like that that just is so fantastic that it's almost an insult to the court's intelligence to sit and listen to something of that nature. And Mr. Hernandez is a bright, articulate, intelligent person, and he must have known that that was a falsehood and that it was not going to be something that would be understood or accepted by the jury.
 
 
 23
 (Tr. V. 1 at 74-75.) Those findings comport with the requirements of Dunnigan. The court found both that Hernandez' testimony was untruthful, and that the untruth was intentional rather than the result of confusion or mistake. Moreover, our review of the record convinces us that the court's credibility determination was not clearly erroneous. Hernandez' testimony was at points either contradicted by various exhibits (see, e.g., Tr. V. 34 at 59-63) or in outright conflict with the testimony of other witnesses (see, e.g., Tr. V. 23 at 140-142; Tr. V. 34 at 12-13.) The obstruction of justice enhancement therefore was not clearly erroneous.
 
 IV. Bregantini
 A. Amount of Loss
 
 24
 Bregantini contests the district court's finding for sentencing purposes that the loss attributable to the conspiracy was $455,000. The court arrived at that figure based on the following calculations. Approximately 750 credit card account numbers were found in Faries' jail cell. Inquiries were sent to each of those account holders, asking whether their account numbers had been used without authorization. Approximately 250 card holders responded, some indicating that their account numbers had been fraudulently used, others indicating that theirs had not. The total amount of fraudulent use on those 250 accounts was approximately $135,000. The court then multiplied that figure by three (to account for the fact that only 1/3 of the account holders had responded to the inquiry) to arrive at an estimated loss amount of $405,000 for the credit card fraud. The court then added $50,000 to reflect "Federal Expense items and other losses incurred by a variety of other individuals in connection with the scheme." (Tr. V. 35 at 35.)
 
 
 25
 Guidelines section 2F1.1(b)(1), which applies to offenses involving fraud, provides for a base offense level of six, to be increased depending on the amount of "probable or intended" loss. Bregantini was sentenced under subsection (H) of the guideline, which provides for a seven-level increase for offenses involving a loss amount of $200,001-$500,000.[5] The district court's loss calculation is a factual finding that we review for clear error, although the meaning of "loss" for purposes of section 2F1.1 is a question of law that is subject to de novo review. United States v. Chevalier, 1 F.3d 581, 585 (7th Cir.1993); United States v. Strozier, 981 F.2d 281, 283 (7th Cir.1992).
 
 
 26
 Here, Bregantini argues that the district court's calculation of loss amount "is not supported by the record and was impermissibly based on pure speculation and gross estimates." (Bregantini brief at 12.) Application note 8 to section 2F1.1 provides:
 
 
 27
 The amount of loss need not be precise. The court is not expected to identify each victim and the loss he suffered to arrive at an exact figure. The court need only make a reasonable estimate of the range of loss, given the available information. The estimate may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations.
 
 
 28
 The district court did just that. The figure of $135,000 for the 250 cards is undisputed.[6] That figure provided a basis from which to estimate the average loss to each victim, which is precisely what the court did.[7] Even if the loss to the 500 non-respondents was not actual, it was certainly fair to calculate the intended loss to those accounts based on the known loss to the 250 accounts.[8] Bregantini's contention that the guideline does not apply to intended losses is simply without merit. See, e.g., United States v. Holiusa, 13 F.3d 1043 (7th Cir.1994). In addition, the application note requires only a calculation of the range of loss. Thus, although the district court did arrive at a specific figure, the relevant fact for sentencing purposes is only that Bregantini fell within the range of $200,001-$500,000. There is no doubt that the court's calculation of actual or intended loss was not clearly erroneous at least within that range.
 
 
 29
 Finally, Bregantini argues that he should not be sentenced based on the evidence relating to Faries, because not all of Faries' activity was reasonably foreseeable to Bregantini. In United States v. Edwards, 945 F.2d 1387, 1391 (7th Cir.1991), cert. denied, 112 S.Ct. 1590 (1992), we held that "there are two limiting factors on the use of conduct in calculating the sentence of a conspiracy defendant. The conduct must be 1) in furtherance of the conspiracy and 2) reasonably foreseeable to the defendant." Bregantini does not content that the conduct was not in furtherance of the conspiracy, but argues only that it was not reasonably foreseeable to him. A defendant need not have engaged in the conduct himself in order for the conduct to be reasonably foreseeable to him. Instead he may be held accountable for the conduct if he either knew or reasonably should have known of the conduct. Id. at 1394. We explained in Edwards that "conduct of co-conspirators ... can be considered 'reasonably foreseeable' to a particular defendant if that defendant has demonstrated a substantial degree of commitment to the conspiracy's objective, either through his words or his conduct." Id. Here, the evidence clearly established that Bregantini demonstrated a substantial degree of commitment to the conspiracy's objectives. The intercepted telephone conversations between Bregantini and Faries make clear that the two were at the center of the conspiracy. Bregantini was involved in coordinating all aspects of the conspiracy--obtaining credit card numbers, coordinating the shipment and receipt of fraudulently obtained merchandise, and distributing telephone access codes.
 
 
 30
 The application notes to Guidelines section 1B1.3 provide further insight into the meaning of reasonable foreseeability. The following example sheds light on application of the requirement under the facts of this case:
 
 
 31
 Defendants F and G, working together, design and execute a scheme to sell fraudulent stocks by telephone. Defendant F fraudulently obtains $20,000. Defendant G fraudulently obtains $35,000. Each is convicted of mail fraud. Defendants F and G each are accountable for the entire amount ($55,000). Each defendant is accountable for the amount he personally obtained under subsection (a)(1)(A). Each defendant is accountable for the amount obtained by his accomplice under subsection (a)(1)(B) because the conduct of each was in furtherance of the jointly undertaken criminal activity and was reasonably foreseeable in connection with that criminal activity.
 
 
 32
 U.S.S.G. Sec. 1B1.3, Application Note 2(c)(2).[9] As in that example, Bregantini was involved with Faries in designing and executing the scheme. He can therefore be sentenced based on the full loss amount attributable to the scheme, even though he may not have been aware of each of Faries' separate transactions.
 
 B. Criminal History Departure
 
 33
 The district court departed upward from criminal history category I to category II to account for two instances of past criminal conduct that were not otherwise accounted for because they had not resulted in criminal charges or convictions. These included participation in a 1985 credit card fraud scheme and a 1986 nightclub arson. Although no charges had been brought in connection with these offenses, the government presented witnesses and other evidence implicating Bregantini. Bregantini presented no contrary evidence, and the court found that these past offenses had been established by a preponderance of the evidence. Bregantini's PSR included several additional past offenses that had resulted in arrest but not conviction, which the district court did not consider in determining Bregantini's criminal history category.
 
 Guidelines section 4A1.3 provides:
 
 34
 If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range.
 
 
 35
 Bregantini argues that the court should not have considered the past offenses under that guideline, because they had not resulted in criminal charges or, of course, conviction. But conviction is not a necessary prerequisite to a section 4A1.3 departure. Included among the information the court may consider, for example, the guideline lists "prior similar adult criminal conduct not resulting in a criminal conviction." U.S.S.G. Sec. 4A1.3(e).[10] Bregantini argues that even if conviction is not required, arrest should be a minimal prerequisite. But that distinction is not supported by the case law. Indeed, we have held that an arrest record alone does not constitute "reliable information" for purposes of section 4A1.3, but that the court must look to the facts that underlie it. United States v. Terry, 930 F.2d 542, 545-46 (7th Cir.1991). By the same token, the lack of an arrest is not particularly instructive, when the government has established the criminal conduct by a preponderance of the evidence. In United States v. Fonner, 920 F.2d 1330, 1332 (7th Cir.1990), we held that the court could depart even on the basis of conduct for which the defendant had been acquitted. We explained that the relevant question for sentencing purposes is whether the past conduct has been established by a preponderance of the evidence. Id. at 1333. Because the government succeeded in meeting that standard here, the court's departure on the basis of the past conduct was appropriate.
 
 
 36
 Bregantini also argues that the departure was inappropriate because his criminal history is not comparable to that of defendants who belong in Category II. That argument is without merit. Category II applies to defendants who have two or three criminal history points. Two criminal history points requires only one prior sentence of incarceration of at least sixty days. U.S.S.G. Sec. 4A1.1(b). Having determined that the court properly considered the two past offenses, it is clear that they are at least analogous to conduct that would produce two criminal history points.
 
 
 37
 Bregantini also objects to the district court's indication that the departure would have been alternatively warranted under section 5K2.5 because the amount of loss had been underassessed. The court stated, "the loss that is assessed here is substantially greater than that that has been tabulated, and that in and of itself would in the court's judgment justify a departure upward in this case" (Tr. V. 36 at 80.) and "increasing it to category II ... also would address the 5K2.5 loss that the court determined was appropriate here" (Id. at 83). But, we need not address the question of whether a 5K2.5 departure would have been appropriate because, despite the court's indication that section 5K2.5 would have provided an alternate ground for departure, the court did not in fact depart on that basis. The court's comments were therefore essentially gratuitous and not relevant to our review.
 
 C. Double Counting
 
 38
 Finally, Bregantini argues that the district court engaged in impermissible double counting when it increased his offense level by two for more than minimal planning under Guidelines section 2F1.1(b)(2) and by four because he was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive" pursuant to Guidelines section 3B1.1(a).
 
 
 39
 As Bregantini acknowledges, however, we have previously considered and rejected this argument in United States v. Boula, 932 F.2d 651, 654-55 (7th Cir.1991). As in Boula, the two increases in this case clearly account for two different aspects of Bregantini's offense. The section 2F1.1(b)(2) increase is justified to account for the "more than minimal planning," which "is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune." See U.S.S.G. Sec. 2F1.1, Application Note 2; U.S.S.G. Sec. 1B1.1, Application Note 1(f) (1988 Ed.). The section 3B1.1 increase, on the other hand, reflects Bregantini's leadership role in the scheme.
 
 V.
 
 40
 For these reasons, the defendants' convictions and sentences are affirmed.
 
 
 
 [1]
 Hernandez' severance argument would in any event have failed to withstand review on its merits. Although Hernandez baldly asserts that he was prejudiced by the district court's refusal to sever, he has not even attempted to set out for us why that might be true. He has therefore failed to meet the heavy burden that is required in order to overturn a district court's denial of a severance motion. See United States v. Neely, 980 F.2d 1074, 1090 (7th Cir.1992)
 
 
 [2]
 Fed.R.Ev. 703 provides:
 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
 
 
 [3]
 The documents had been properly authenticated and admitted into evidence. Although Hernandez' counsel questioned the authenticity of the handwriting exemplar at oral argument, that is a separate evidentiary issue that does not affect the Rule 703 analysis, and that Hernandez did not otherwise pursue
 
 
 [4]
 Although he did not make this suggestion below, his appellate brief states, "a trustworthiness issue is present. A prosecution agent/expert cannot and should not, be allowed to reasonably rely upon the prosecutor's hearsay." (Hernandez Brief at 14.)
 
 
 [5]
 A November 1989 amendment to section 2F1.1 changed the offense levels associated with various loss amounts. Bregantini was sentenced under the pre-1989 version, which was appropriate in light of the fact that application of the newer guideline would have resulted in a higher sentence. See United States v. Harris, 994 F.2d 412, 416 n. 9 (7th Cir.1993)
 
 
 [6]
 Although Bregantini does not outright concede the accuracy of the $135,000 figure on appeal, he did so during the sentencing hearing when he stated for example "I would submit that the figure of $135,--$135,000 is the point we should focus on and the point that the government has acknowledged is a reasonably accurate figure. (Tr. V. 35 at 33-34.) Not having challenged the accuracy of that figure below, he has waived his opportunity to do so on appeal. United States v. Haddon, 927 F.2d 942, 952 (7th Cir.1991). Indeed, there appears to be no grounds on which the accuracy of that figure is subject to question
 
 
 [7]
 The court noted that multiplying the total of $135,000 by three to account for the 750 account numbers was equivalent to dividing $135,000 by 250, to reach a per account average loss of $540, and multiplying that number by 750. (See Tr. V. 350 at 34.)
 
 
 [8]
 At oral argument the government was asked why failure to respond should not be assumed to indicate lack of injury. The government responded that it did not believe that injured parties would be more likely to respond, because they had been made whole by their credit card companies and so had no motivation to pursue the matter. In any event, the court's calculation, even if not indicative of actual loss, was certainly a reasonable approximation of intended loss. It is fair to assume that Faries intended to use the account numbers that he had collected and would have done so if the scheme had not been interrupted
 
 
 [9]
 Although the application note was added as part of the 1989 Guidelines amendments, the language of section 1B1.3 did not change. The application note therefore sheds light on the meaning of the pre-1989 guideline as well
 
 
 [10]
 Of course, we are not suggesting that arson and fraud are "similar," but this example nonetheless rebuts Bregantini's argument that a conviction is required