53 F.3d 334
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Alfred J. GALLUZZO, Defendant-Appellant.
 No. 94-3855.
 United States Court of Appeals, Seventh Circuit.
 Argued April 25, 1995.
Decided May 2, 1995.
 
 Before Flaum, Ripple and Kanne, Circuit Judges.
 
 ORDER
 
 1
 Alfred J. Galluzzo practiced as a podiatrist at the Galluzzo Foot Clinic in Janesville and Delavan, Wisconsin from 1978 to 1993. In 1994, he pled guilty to one count of submitting a false health insurance claim to Medicare, in violation of 18 U.S.C. Sec. 287, and one count of unlawfully selling a promotional drug sample, in violation of 21 U.S.C. Secs. 353(c)(1) and 331(t). The district court found that Galluzzo's relevant conduct resulted in a loss of approximately $18,000. Thus, Galluzzo received a three-level enhancement under U.S.S.G. Sec. 2F1.1(b)(1)(D), giving him an adjusted offense level of 11 and a criminal history category of I, yielding a sentencing range of 8-14 months. The district court imposed a sentence of 11 months imprisonment, three years of supervised release, and a $20,000 fine. On appeal, Galluzzo argues that the district court incorrectly calculated the amount of the loss.
 
 I. "Reasonable Estimate" Under Sec. 2F1.1
 
 2
 Under Sec. 2F1.1, the amount of a victim's loss "need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. Sec. 2F1.1, Application Note 8; see also United States v. Narvaez, 995 F.2d 759, 764 (7th Cir. 1993). The district court's calculation of the amount of the loss is a factual determination reviewed for clear error. United States v. Johnson, 16 F.3d 166, 170 (7th Cir. 1994); United States v. Chevalier, 1 F.3d 581, 585 (7th Cir. 1993). The government bears the burden of proving facts at sentencing by a preponderance of evidence. United States v. Hatchett, 31 F.3d 1411, 1418 (7th Cir. 1994); United States v. Porter, 23 F.3d 1274, 1277 (7th Cir. 1994).
 
 
 3
 Galluzzo concedes that the district court may use estimates and approximations in determining the amount of the loss. He contends, however, that the evidence presented at sentencing was insufficient to establish a loss in excess of $10,000.[1]
 
 A. Loss Calculations
 
 4
 At sentencing, the government contended that Galluzzo defrauded Medicare over a four-year period, from 1989-1992. The fraud consisted primarily of falsified doppler (blood circulation) and blood test claims submitted to Medicare during that period.[2] Medicare will not pay for doppler tests performed after surgery. The evidence demonstrated that Galluzzo altered documentation to reflect that tests actually performed after surgery were done before surgery. In addition, the evidence showed that Galluzzo had not performed any of the blood tests for which he requested Medicare payments: Galluzzo routinely discarded untested blood in the regular trash, and his office did not even contain the necessary equipment to conduct blood tests.
 
 
 5
 The prosecution presented no evidence of any specific fraudulent doppler claims. Rather, the government relied on estimations. Galluzzo himself admitted that 10% of the doppler claims he submitted to medicare were fraudulent.[3] Rachel Johnson, who worked as a medical assistant for Galluzzo between April 1991 and August 1992, estimated that at least half of the doppler tests were performed after surgery. Shelley Dykes, an assistant from August 1992 to February 1993, stated that 80% of the doppler claims were fraudulent. After considering these various estimates, the district court determined that 20% of the doppler claims were fraudulent.
 
 
 6
 The Wisconsin Physicians Service (WPS), which handles Medicare Part B claims in Wisconsin, provided the government with the total doppler and blood tests payments made to Galluzzo in 1991 and 1992. Using the district court's conclusion that 20% of the doppler claims and all of the blood test claims were fraudulent, the total loss for 1991-92 comes to approximately $11,000.[4] For 1989 and 1990, the government obtained only the figures for total medicare payments made to Galluzzo. By assuming that the blood and doppler payments comprised approximately the same percentage of total payments in 1989-90 as in 1991-92, the government estimated that an additional $6,400 in fraudulent claims were submitted in 1989 and 1990, bringing the total loss to approximately $18,000.[5] Thus, the district court applied Sec. 2F1.1(b)(1)(D), which mandates a three-level enhancement if the amount of the loss falls between $10,000 and $20,000. Galluzzo argues that the district court's finding that the loss exceeded $10,000 is not supported by the evidence.
 
 B. Reasonableness of the Estimates
 
 7
 While the courts may use estimates in computing the amount of the loss, they "must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines." United States v. Wilson, 993 F.2d 214, 218 (11th Cir. 1993). Galluzzo argues that the process used by the district court to determine the loss constituted mere speculation. We disagree. In a number of previous cases, this court and others have found that estimates involving statistical calculations may be reasonable. See Narvaez, 995 F.2d at 764; United States v. McAlpine, 32 F.3d 484, 488 (10th Cir. 1994), cert. denied, 115 S. Ct. 610 (1994); United States v. Sutton, 13 F.3d 595, 599-600 (2d Cir. 1994); United States v. Koenig, 952 F.2d 267, 271 (9th Cir. 1991). At least for the years 1991 and 1992, the district court's estimates are both reasonable and supported by a sufficient factual basis.[6] Galluzzo's office did not contain all the equipment necessary to conduct blood tests; thus, the court could reasonably conclude that he did not in fact conduct any of the blood tests for which he sought reimbursement. In addition, the court's conclusion that 20% of the doppler tests were performed after surgery was reasonable. The estimates ranged from 10% (Galluzzo's estimate) to 80% (Dykes' estimate). Given the wide disparity in the estimates, the 20% figure selected by the district court is certainly reasonable and most likely conservative.[7] Thus, the district court's determination that the loss for 1991 and 1992 was approximately $11,000 is not clearly erroneous.
 
 
 8
 The estimates for 1989 and 1990, however, may be open to question. The calculations were based on the assumption that the percentage of doppler and blood test claims remained constant between 1989 and 1992. Agent Isley, who prepared the estimates for the government, admitted that he had no basis for this assumption; rather, it was merely a "guess." In addition, aside from general assertions that some types of fraud had been occurring since 1988, the government presented no evidence that Galluzzo had falsified doppler claims before 1991. The courts may not use faulty statistical models to estimate the loss, cf. United States v. Abud-Sanchez, 973 F.2d 835, 838 (10th Cir. 1992), nor may they accept estimates that lack a sufficient factual basis. See Chevalier, 1 F.3d at 586; United States v. Reddeck, 22 F.3d 1504, 1513 (10th Cir. 1994); United States v. Smith, 951 F.2d 1164, 1168-69 (10th Cir. 1991). Thus, the district court should not have counted the approximately $6,400 of fraud that allegedly occurred in 1989 and 1990 in calculating the total loss. Even if the loss for 1989-90 is excluded, however, Galluzzo's offense level remains the same. The loss from claims submitted in 1991 and 1992 is approximately $11,000, which would still warrant a three-level enhancement under Sec. 2F1.1(b)(1)(D). Thus, any error committed by the district court in this regard is harmless. Galluzzo, however, offers one final argument that the error was material.
 
 
 9
 II. Reduction for Restitution Prior to Adjudication of Guilt
 
 
 10
 Galluzzo argues that the amount of the loss should be reduced by an additional $5,033.19 that he repaid to Medicare in May 1993. When this reduction is combined with the elimination of the estimated loss from 1989-90, the amount of the loss becomes approximately $6,000, which would warrant only a two level enhancement under Sec. 2F1.1(b)(1)(C). Galluzzo did not present this argument to the district court; thus, we review for plain error only. United States v. Jackson, 974 F.2d 57, 60 (7th Cir. 1992), cert. denied, 113 S. Ct. 2976 (1993).
 
 
 11
 The loss under Sec. 2F1.1 is the amount at "the moment the loss is detected." United States v. Mau, 45 F.3d 212, 216 (7th Cir. 1995); see also Johnson, 16 F.3d at 170; United States v. Holiusa, 13 F.3d 1043, 1046 (7th Cir. 1994); United States v. Shaffer, 35 F.3d 110, 115 (3d Cir. 1994); United States v. Mummert, 34 F.3d 201, 204 (3d Cir. 1994). During a search of his office on February 12, 1993, Galluzzo admitted that he had submitted fraudulent claims to Medicare. The repayment did not take place until May 1993. Thus, his criminal activity was detected three months before the $5,033 in restitution was paid. Under Mau, Johnson, and Holiusa, Galluzzo may not seek a reduction in the amount of the loss under Sec. 2F1.1 for this payment.[8] The district court's estimation that the amount of the loss exceeded $10,000 was reasonable; accordingly, Galluzzo's sentence is
 
 
 12
 AFFIRMED.
 
 
 
 [1]
 Galluzzo's offense level would be one point lower if the loss fell in the $5,000 to $10,000 range, two points lower if it fell between $2,000 and $5,000, and three points lower if it were $2,000 or less. U.S.S.G. Sec. 2F1.1
 
 
 [2]
 In addition, the parties stipulated to a loss of $750 from the sale of sample drugs
 
 
 [3]
 Galluzzo did not identify the time period during which he submitted fraudulent claims to Medicare
 
 
 [4]
 In 1992, Galluzzo received $13,126 in payments for doppler tests and $561 for blood tests. In 1991, he received $34,281 in doppler payments and $829 in blood test payments. For these two years, the totals are $47,407 in doppler payments and $1,390 in blood test payments. Using the district court's determination that 20% of the doppler payments were fraudulent, the total loss for 1991-92 would be $9,481.40 in doppler payments and $1,390 in blood test payments, for a total of $10,871.40
 
 
 [5]
 Doppler tests constituted 35.01% of the Medicare payments to Galluzzo in 1991 and 1992. Applying the 35.01% factor to the total payments for 1989 and 1990, Galluzzo received $27,882.85 in doppler payments for 1989 and 1990. Blood tests constituted 1.03% of the Medicare payments to Galluzzo in 1991 and 1992. Applying the 1.03% factor to the total payments for 1989-90, Galluzzo received $820.32 in blood test payments for the two-year period. Thus, the estimated total payments for 1989-92 were $57,289.85 for doppler tests and $2,210.32 for blood tests. Applying the district court's finding that 20% of the doppler payments were fraudulent, the total loss includes $15,057.97 in doppler payments, $2,210.32 in blood test payments, and $750 in sample drug sales, for a total of $18,018.29
 
 
 [6]
 Rachel Johnson and Shelley Dykes provided statements indicating that Galluzzo was submitting falsified doppler test claims as early as 1991. Julie Voss, one of Galluzzo's assistants, stated that blood samples were being discarded untested as early as 1988
 
 
 [7]
 The district court was entitled to believe that Galluzzo's 10% estimate was lower than the actual number. Galluzzo initially denied that he submitted any false doppler or blood test claims. When he finally did admit guilt, Galluzzo still contended that he performed most of the blood tests, despite evidence that he did not have the necessary equipment in his office to perform the tests. Such statements led the probation officer to conclude that Galluzzo "attempted to minimize any criminal intent" relating to his actions
 
 
 [8]
 While restitution paid after the detection of the crime but before the adjudication of guilt is not reduced from the amount of the loss under Sec. 2F1.1, it may be relevant to a reduction for acceptance of responsibility. Chevalier, 1 F.3d at 588; U.S.S.G. Sec. 3E1.1, comment. (n.1(c)). In the instant case, Galluzzo received a two-level acceptance of responsibility reduction for unrelated reasons