UNITED STATES of America, Plaintiff–Appellant, Cross–Appellee,

v.

Bill Gene BEAN, Defendant–Appellee, Cross–Appellant.

Nos. 93–2793, 93–2847.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 18, 1994.

Decided March 9, 1994.

Tina Nommay, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Fort Wayne, IN, for the U.S.

James J. Abbs (argued), Emerick & Diggins, Kendallville, IN, for Bill Gene Bean.

Before POSNER, Chief Judge, and EASTERBROOK and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

A jury convicted Bill Gene Bean of bank fraud, in violation of 18 U.S.C. § 1344. Bean kited checks, obtaining $75,000 to cover a cash-flow shortage in his recycling business. Over the course of two years he repaid (albeit without interest) the sum to which he had helped himself. The district court imposed a sentence of six months' work release. Both sides have appealed—the United States to protest a six-level downward departure for "extraordinary acceptance of responsibility" by repaying the debt, and Bean to protest a two-level increase for more than minimal planning.

Bean went to trial, denying that he intended to defraud a bank. The district court therefore declined to award a regular two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. The prosecutor's principal contention is that a defendant who has not accepted responsibility for his offense—who insists even after being convicted that he has not violated the law—cannot receive a reduction for *extraordinary* acceptance of responsibility. Extraordinary acceptance of responsibility must be a subset of acceptance of responsibility. Yet the district judge's belief that he had to turn outside § 3E1.1 to find authority to consider repayment, which sets up the prosecutor's argument, is incorrect. The Sentencing Guidelines permit a judge to reduce the sentence for repayment whether or not the defendant pleads guilty to the charge. Application Note 1(c) to § 3E1.1 lists "voluntary payment of restitution prior to adjudication of guilt" as an independent reason for a two-level acceptance-of-responsibility reduction. Bean repaid the bank before the adjudication of guilt, and the district court therefore was entitled to award a reduction for acceptance of responsibility even though Bean denied guilt. See *United States v. Carey*, 895 F.2d 318, 323–24 (7th Cir.1990); *United States v. Chevalier*, 1 F.3d 581, 588 (7th Cir.1993). Nothing in *United States v. Seacott*, 15 F.3d 1380, 1388–89 (7th Cir.1994), detracts from the express provision of Application Note 1(c) or the approach of cases such as *Carey* and *Chevalier*. Although some language in *Seacott*, taken in isolation, implies that restitution does not afford any ground to depart from the sentence determined under the Guidelines, a reduction under § 3E1.1 is not a "departure." What is more, the only question before the court in *Seacott* was whether a district judge may reduce a sentence in order to give the defendant a greater opportunity to pay restitution *after* conviction. Such a dispensation, we concluded, is improper. *Seacott* cited and distinguished *Carey*, 15

F.3d at 1388–89, as standing for the proposition that a court may reward restitution that precedes an adjudication of guilt.

Guideline 3E1.1(a) permits a reduction of two levels only. Because Bean's offense level is less than 16, the three-level reduction allowed by § 3E1.1(b) is unavailable. To justify the six-level reduction, the district court turned to § 5K2.0, which, following 18 U.S.C. § 3553(b), permits a court to depart when a particular aggravating or mitigating circumstance is present to a degree that the Sentencing Commission has not taken into account. See *Carey*, 895 F.2d at 323–24. The district court believed that Bean's repayment was so exceptional that it justified triple the reduction provided by § 3E1.1(a). (The court did not explain why six levels, rather than three, four, or five, is appropriate; the number seems to have been chosen as the minimum needed to permit the judge to avoid sending Bean to prison.) Yet all Bean did was to pay off the principal of the involuntary loan before trial. This is *precisely* the conduct described by Application Note 1(c). In *Carey* we set aside, as clearly erroneous, a downward departure for someone who repaid, before conviction, 91% ($200,000 of $220,000) of the sum obtained in a check kiting scheme. It is correspondingly hard to see how full payment of a $75,000 debt could be the basis of an extraordinary departure.

Undoubtedly there are circumstances that would justify using § 5K2.0 to go beyond two levels. Suppose the check kiter repaid the bank in full the day after withdrawing the funds, before the offense had been discovered. If the prosecutor elected to pursue such a person to the full extent of the law, the district judge might curtail the severity of the penalty with a departure. The sentence under the Guidelines depends on the amount withdrawn, but payment the next day may show that the bank was never at risk for the whole sum, and that the ordinary calculation therefore overstated the seriousness of the offense. Although *Carey* and *Seacott* show that circumstances permitting such departures are rare, the possibility remains. But Bean, who put the banks at substantial risk, does not qualify. He did not have the funds to cover his checks; he obtained money this way precisely because his business was short of cash and could not have obtained more credit had he sought a loan honestly. He repaid by installments and had retired less than half of the debt when the prosecutor told him that he was under investigation for fraud. The final installment came only five days before trial. Such events permit a two-level reduction under § 3E1.1, but a departure under § 5K2.0 is clearly erroneous.

Especially when we consider (as the district judge did not) that this is Bean's *third* conviction for defrauding a financial institution. His pattern of conduct, and his plea at trial that he lacked the intent necessary to commit this offense, show that he simply refuses to conform to society's rules. He apparently believes that he is entitled to obtain zero-interest, non-consensual "loans" from financial institutions provided he plans to repay when he can. In repaying the banks, Bean was adhering to his personal moral code, but this is a far cry from acceptance of responsibility, which depends on believable gestures establishing willingness to adhere to political society's laws. *United States v. Beserra*, 967 F.2d 254 (7th Cir. 1992). The prospect of a two-level discount provides an incentive to repay the victim. Any greater reduction must depend on a strong reason to believe, not only that the victims were not at substantial risk, but also that repetition is unlikely. Bean's history shows that these banks were at risk and that he feels at liberty to put other financial institutions at risk when he is strapped for cash. A two-level reduction for such a person is more than generous.

■ Now for Bean's appeal. Guideline 2F1.1(b)(2)(A) calls for an increase in the offense level when the offense involved "more than minimal planning". Application Note 1(f) to Guideline 1B1.1, to which Application Note 2 of Guideline 2F1.1 points, defines this phrase:

"More than minimal planning" means more planning than is typical for commission of the offense in a simple form. "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense....

"More than minimal planning" is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune. Consequently, this adjustment will apply especially frequently in property offenses. . . .

In an embezzlement, a single taking accomplished by a false book entry would constitute only minimal planning. On the other hand, creating purchase orders to, and invoices from, a dummy corporation for merchandise that was never delivered would constitute more than minimal planning, as would several instances of taking money, each accompanied by false entries.

Bean's kite was relatively simple (two checks floated between two banks) and was not carefully planned. Because *all* check kiting involves multiple checks, this offense did not bear signs of unusual planning compared with other kites—although it might entail slightly more planning than materially false statements on a loan application, which also comes within the fraud guideline.

The district judge wrote: "the court is not convinced . . . that Bean's scheme involved more planning than is typical for the commission of the offense in a simple form". Yet the court nonetheless enhanced the offense level because, it believed, Bean tried to conceal the crime. "He took two affirmative steps of insufficient funds check writing, the second of which was taken to conceal the first transgression, and he attempted to arrange to get a personal loan from individuals in order to conceal the violation." Neither of these events establishes an attempt to conceal the offense. Writing multiple checks does not *conceal* the fraud; it is the means by which the fraud succeeds. A bank's customer deposits a check from another institution; in case the first bank checks with the second, to determine whether the check is good, before disbursing the funds, the client deposits another instrument in the account on which the first was written; finally the customer withdraws the balance of the first account. The cycle may be continued, in increasing amounts, as the kite rises ever higher. Bean stopped with one cycle. Had he not attempted to cover the first NSF check with a second, he would not have com-

mitted the crime of bank fraud at all—for § 1344 does not attach criminal penalties to the unadorned writing of rubber checks, and there is some question whether "simple" check kiting violates that statute. Compare *United States v. Stone,* 954 F.2d 1187 (6th Cir.1992), and *United States v. Celesia,* 945 F.2d 756 (4th Cir.1991), with *United States v. Medeles,* 916 F.2d 195 (5th Cir.1990), and *United States v. Bonnett,* 877 F.2d 1450, 1454–55 (10th Cir.1989). Cf. *Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) (check kiting does not violate 18 U.S.C. § 1014, because presentation of a check does not make a "false statement" that the account contains sufficient funds). As for the attempt to obtain a loan and repay the bank: check kiting is a crime because withdrawing the float amounts to taking a loan to which the bank did not consent. Obtaining a *consensual* loan to cover the NSF check is not an aggravated degree of check kiting; it is a means to speed repayment and thus is a ground for reducing the gravity of the offense.

■ The right question to ask is whether Bean's offense involved more planning than is usual for bank fraud. Recall that the note to § 1B1.1 speaks of more planning "than is typical for commission of the offense in its simple form." The "offense" is the crime of which the defendant has been convicted, not of the particular way in which he committed it. Thus the district court should compare the circumstances of this case with other fraud offenses, and not only with frauds committed by kiting checks. The court also must exclude factors "already taken into account in the base offense guideline. Otherwise there would be double counting." *United States v. Lallemand,* 989 F.2d 936, 939 (7th Cir.1993). The district court should consider this question afresh; we do not prescribe the outcome. See *United States v. Doherty,* 969 F.2d 425, 430 (7th Cir.1992) (affirming a decision that the circumstances of an ordinary check kite do not compel adjustment for more than minimal planning, but adding that they may permit the adjustment); *United States v. Starr,* 986 F.2d 281 (8th Cir.1993) (a kite involving transactions spanning six months, and use of an alias,

supports an adjustment for more than minimal planning).

The judgment is vacated, and the case is remanded for resentencing in conformity with this opinion.