**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John P. MAU, Defendant–Appellant.**

No. 94–2004.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 30, 1994.

Decided Jan. 18, 1995.

David A. Glockner, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Crim. Div.,

Chicago, IL, Barry Rand Elden, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

John F. Murphy, Andrea Gambino (argued), Office of the Federal Defender Program, Chicago, IL, for defendant-appellant.

Before FLAUM, RIPPLE, and GARZA,* Circuit Judges.

FLAUM, Circuit Judge.

Defendant John P. Mau pleaded guilty to bank fraud under 18 U.S.C. § 1344(a)(1) and received an eight month sentence. Mau argues on appeal that the district court incorrectly sentenced him under the guidelines by improperly enhancing his sentencing for "more than minimal planning" and by erring in the calculation of the loss suffered as a result of the bank fraud. We hold that the district court made no errors in applying the sentencing guidelines and now affirm.

## I.

In 1988, John P. Mau formed "401 Partners," a limited partnership of which Mau was the sole general partner, to operate a Chicago nightclub named "Traffic Jam." Mau obtained financing for the nightclub with a series of loans from Cosmopolitan National Bank of Chicago. He also maintained checking accounts for 401 Partners at both Cosmopolitan and Mount Greenwood Bank of Chicago. Additionally, Mau himself had another checking account at Mount Greenwood, from which account he paid expenses for an apartment building that he owned.

The Traffic Jam soon had cash flow problems as a result of construction cost overruns and slow business. Consequently, around January 1990, Mau began addressing these problems by kiting checks among his three accounts.[1] The kite continued until August 7, 1990, when Mount Greenwood detected the kite and closed his account. During the kite, Mau deposited checks worth $13,999,042 into the various accounts, of which $12,800,722 were from checks written from one of the three accounts to another. When the kite ended, Mau had an overdraft at Cosmopolitan totaling $69,862.86.

Cosmopolitan demanded that Mau sign a note for the amount of the overdraft and provide collateral to secure this note. Mau complied, pledging as collateral a southwest Chicago building that housed the "Waltzing Matilda," a bar Mau also owned and operated. The agreement pledging the Waltzing Matilda property contained standard cross-collateralization language, which permitted Cosmopolitan to consider any collateral pledged for the note as additional collateral for Mau's other loans at Cosmopolitan, of which Mau had two.

Mau eventually defaulted on all three loans. In its efforts to recoup the money loaned to Mau, Cosmopolitan foreclosed on the Waltzing Matilda property. Cosmopolitan cleared title to the property at a cost of $116,291 and then advertised the property for sale at an auction, at which Cosmopolitan itself purchased the property for $75,000.

The collateral Mau had pledged against his other two loans proved insufficient to cover those loans. Accordingly, Cosmopolitan exercised its rights under the cross-collateralization clause in the "check-kiting" note to apply the $75,000 from the sale to those two loans. Even after applying the $75,000, however, Cosmopolitan was still owed more than $130,000 in unreimbursed principal on these two loans. Cosmopolitan thus charged off this $130,000, as well as $66,862 arising from the check kite,[2] as a loss.

On February 15, 1994, Mau pleaded guilty to a one-count indictment charging him with perpetrating bank fraud under 18 U.S.C.

---

* The Honorable Emilio M. Garza of the United States Court of Appeals for the Fifth Circuit is sitting by designation.

1. "Check kiting, at root, is a plan designed to separate the bank from its money by tricking it into inflating bank balances and honoring checks drawn against accounts with insufficient funds."

United States v. Doherty, 969 F.2d 425 (7th Cir. 1992); cert. denied, — U.S. ——, 113 S.Ct. 607, 121 L.Ed.2d 542 (1992).

2. Mau had made some payments on the check-kite loan before defaulting, of which $3000 were credited to the principal of the loan.

§ 1344(a)(1). Bank fraud gave Mau a base offense level of six under the Sentencing Guidelines. U.S.S.G. § 2F1.1(a). The district court enhanced this base level by two points for more than minimal planning, U.S.S.G. § 2F1.1(b)(2)(A), by five points for the loss to the bank of $66,862, U.S.S.G. § 2F1.1(b)(1)(F), and reduced it by two points for acceptance of responsibility, U.S.S.G. § 3E1.1(a), resulting in an offense level of eleven. Mau's lack of a criminal record, which placed him in the Criminal History I category, gave the district court a sentencing range of eight to fourteen months. Mau was sentenced on April 21, 1994, to an eight-month split sentence—four months incarceration and four months electronic monitoring—to be followed by three years supervised release and a $50 Special Assessment. Mau now appeals the enhancements to his sentence.

## II.

Mau first argues that he should not have received an upward adjustment for more than minimal planning under U.S.S.G. § 2F1.1(b)(2)(A). Mau contends that this enhancement is inapplicable in his case because the district court focused on improper considerations: the number and dollar amount of the checks Mau kited and Mau's level of sophistication.[3] Rather, Mau asserts, the court should have determined whether "the offense involved more planning than is usual for bank fraud in general." *United States v. Bean*, 18 F.3d 1367, 1370 (7th Cir.1994); U.S.S.G. § 1B1.1, application note 1(f). We review an enhancement for "more than minimal planning" for clear error only. *United States v. Doherty*, 969 F.2d 425, 430 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 607, 121 L.Ed.2d 542 (1992).

While the Sentencing Guidelines do indicate that "[m]ore than minimal planning' means more planning than is typical for commission of the offense in a simple form," they also specifically state that " '[m]ore than minimal planning' is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune." U.S.S.G. § 1B1.1, application note 1(f). We held in *Doherty*, a check-kiting case, that the district court clearly erred when it ignored the Guidelines' "repeated acts" language and focused solely on whether Doherty's kite involved more planning than is necessary for the commission of a typical check kiting or bank fraud scheme. *Doherty*, 969 F.2d at 430. We concluded that "[d]rafting 40 overdraft checks during a single month, few if any of which appear to have been purely opportune, arguably fits this profile" and remanded the case for reconsideration of this enhancement. *Id.*

*Doherty's* logic and result apply directly to the instant case. Mau kited a huge volume of checks over a period of seven months. Like the volume and the face amount of those checks, Mau's business experience tends to prove that the kiting was not "purely opportune." The district court thus considered exactly what it should have considered under § 2F1.1(b)(2)(A), and no additional evidence of more extensive planning was necessary. Even if a district court would not have to find more than minimal planning because of the volume of checks Mau kited, *Doherty* dictates that the district court did not err in so finding.

Finally, our decision in *Bean*, is not to the contrary. In *Bean*, the district court had elevated the defendant's sentence for a single check kite based on yet more language in U.S.S.G. § 1B1.1, application note 1(f), to the effect that more than minimal planning "also exists if significant affirmative steps were taken to conceal the offense." *Bean*, 18 F.3d at 1369-70. In remanding the case for consideration of whether Bean's offense involved more planning than is usual for bank fraud, we held that Bean's check kiting did not, in and of itself, constitute concealment because "[w]riting multiple checks does not *conceal* the fraud; it is the means by which the fraud succeeds." *Id.* at 1370. Mau argues that *Bean* does not permit a court to consider the number of checks kited. In *Bean*, however, this Court did not ask the district court to consider Bean's "repeated acts" because Bean had only kited one check. *Bean* in no

---

**3.** The district court found that Mau was an experienced businessman who had an MBA from Northwestern University and taught business-related classes at St. Xavier College.

way stands for proposition that large-volume check kiting alone cannot qualify as more than minimal planning.

### III.

■■ Mau also contends that the district court erred in adding five points to his base offense level under U.S.S.G. § 2F1.1(b)(1)(F) for a loss to Cosmopolitan of $66,862 as a result of the check kiting. Mau argues that the district court is obliged to assess the net detriment to the victim in determining a loss under § 2F1.1, *see United States v. Holiusa,* 13 F.3d 1043, 1045–47 (7th Cir.1994); *United States v. Mount,* 966 F.2d 262, 265 (7th Cir. 1992), and argues that the district court therefore misinterpreted "loss." Mau compares his conduct to a request for a fraudulent loan, in which case any loss should be measured by Cosmopolitan's "actual loss" or the loss Mau intended to cause Cosmopolitan. *See* U.S.S.G. § 2F1.1 application note 7(b). Since Mau intended to cause no loss, and since the note he signed to address the check kiting, as well as the collateral he placed behind the note, left the bank with no loss, Mau asserts that no loss enhancement should apply to him. Because Mau is contesting the meaning of "loss" under § 2F1.1, he presents a question of law subject to *de novo* review. *Holiusa,* 13 F.3d at 1045.

Although we have not previously addressed the precise issue Mau raises in his appeal, this Court has considered the proper place in the Sentencing Guidelines for voluntary restitution following check kiting. In *United States v. Carey,* 895 F.2d 318 (7th Cir.1990), a defendant convicted of kiting $220,000 had repaid $200,000 by the time of his sentencing. The district court calculated the defendant's loss at $220,000 but then reduced the defendant's sentencing level significantly, in part because the district court thought that this was one of those "few instances" in which "the loss determined under subsection (b)(1) may overstate the seriousness of the offense" and where a "downward departure may be warranted." *See* U.S.S.G. § 2F1.1, application note 10. The *Carey* court reversed, noting that the Guidelines permit a downward departure for restitution under the provision for acceptance of respon-

sibility, U.S.S.G. § 3E1.1, or under the exception in U.S.S.G. § 5K2.0, which permits a downward departure where there is a circumstance present to a degree that the Sentencing Commission has not taken into account. *Carey,* 895 F.2d at 323. Therefore, the court determined, restitution could not also be used to depart downward from a loss calculation. *Id. See also Bean,* 18 F.3d at 1369 (holding that a departure under U.S.S.G. § 5K2.0 could not be allowed for a pre-trial restitution of the entirety of a $75,-000 check-kiting loss).

The Fifth Circuit, however, directly confronted Mau's argument in *United States v. Frydenlund,* 990 F.2d 822 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 192, 126 L.Ed.2d 150 (1993), and —— U.S. ——, 114 S.Ct. 337, 126 L.Ed.2d 281 (1993). In *Frydenlund,* several defendants had, through a check kiting scheme, left a bank with overdrafts totaling $1.5 million. The defendants subsequently executed a promissory note for the full amount of the overdraft, secured by a lien on car dealership properties which one of the defendants owned. On the basis of the note, the defendants' intent to pay the note, and the substantial collateral supporting the note, the defendants argued that the real loss to the bank was zero and that their sentencing enhancements under § 2F1.1 were therefore improper. *Id.* at 824–25. Specifically, the defendants submitted that the court treat a check kite like a fraudulent loan application and that the bank's loss should be considered "the amount of the loan not repaid at the time the offense is discovered." U.S.S.G. § 2F1.1, application note 7(b).

The *Frydenlund* court disagreed. First, the court determined, "check kiting is not more equivalent to a fraudulent loan transaction than to simple theft." *Frydenlund,* 990 F.2d at 826. In a fraudulent loan case, a bank has "at least voiced its approval of the credit extended on a fraudulently obtained loan, while a check kite is done surreptitiously precisely because the bank would under no circumstances have lent to the kiter." *Id.* A bank lending money on a fraudulent loan has voluntarily limited its risk in lending, whereas a check kiter faces no such limits. *Id.*

Alternatively, the *Frydenlund* court noted, even if check kiting were considered analogous to obtaining a fraudulent loan, the district court had found that the bank had actually lost $1.5 million, notwithstanding the defendants' agreement to repay that amount. The district court determined that a sale of the car dealership was unlikely to cover the entire value, that any proceeds of a sale would be tied up in other litigation and not immediately available to repay the bank, and that defendants had not yet made any payments to reduce the $1.5 million loss. "Thus, although it is possible that the actual loss may in some cases be less than the overdraft when the kite is discovered, [the defendants] did not persuade the court of that in [this] case." *Id.*

*Frydenlund's* reasoning is both persuasive and in complete accord with *Carey* and *Bean*.[4] The Guidelines stipulate that in fraud cases, "[a]s in theft cases, loss is the value of the money, property or services unlawfully taken...." U.S.S.G. § 2F1.1 application note 7. The time to determine that loss in a check-kiting scheme is the moment the loss is detected. *Accord, United States v. Shaffer*, 35 F.3d 110, 114 (3d Cir.1994) (adopting *Frydenlund* analysis and noting that "check kiting crimes, because of their particular nature, are crimes where the district court must calculate the victim's actual loss as it exists at the time the offense is detected...."); *cf. Mount*, 966 F.2d at 266 (noting in an embezzlement case that "[t]he embezzler causes loss in the full amount taken, despite plans to repay, because the employer is at risk in the interim and lacks a ready source of recompense"); *id.* at 267 (Ripple, J., concurring) (joining the judgment of the court because it takes "a common-sense approach that avoids making the term of a criminal sentence turn on conjecture."). In the instant case, the bank had a loss of at least $66,862 as a result of the check kiting scheme. The fact that a check kiter enters into a repayment scheme after the loss has been discovered does not change the fact of the loss; such fact merely indicates some acceptance of responsibility.

■ Even if we were to analogize Mau's case to a fraudulent loan case, two huge obstacles would still remain in Mau's path: Cosmopolitan sustained both an intended and an actual loss. First, when calculating an "intended" loss in a fraudulent loan case, the amount of the loan can only be offset by the value of the collateral the bank has or expects to gain at the time the fraud is discovered. *See* U.S.S.G. § 2F1.1, application note 7(b) (noting that the "loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan"); *United States v. Mummert*, 34 F.3d 201, 204 (3d Cir.1994) ("A defendant in a fraud case should not be able to reduce the amount of loss for sentencing purposes by offering to make restitution after being caught."); *cf. United States v. Johnson*, 16 F.3d 166, 170–71 (7th Cir.1994); *Carey*, 895 F.2d at 323. At the time Cosmopolitan discovered Mau's kite in August, Mau did not have any assets pledged to secure the kite; Mau secured a note on the money taken through the kite only in September. Under our interpretation of the Guidelines, Mau "intended" Cosmopolitan to suffer a loss in the amount of the kite.

■ Second, even assuming no intended loss, Cosmopolitan actually lost $66,892 as a result of Mau's check kiting. Mau replies that the proceeds from the sale of the Waltzing Matilda property more than covered the value of the kite. By allowing Cosmopolitan to apply the sale proceeds from that property to Mau's other loans, Mau argues, the district court permitted the bank to create a net detriment to itself it would not otherwise have suffered. Similarly, Mau continues, in making a loss determination under the Sentencing Guidelines, a district court must not consider legitimate loans and other conduct that does not amount to relevant conduct. Therefore, Mau asserts, the district court impermissibly considered Mau's legitimate loans when it followed Cosmopolitan's assign-

---

**4.** *Frydenlund's* explicit reliance on *Carey* reinforces this conclusion. *Frydenlund*, 990 F.2d at 826.

ment of the proceeds from the collateral pledged to the check kite note to Mau's other loans.

Contrary to Mau's assertions, the district court was under no obligation to consider collateral Mau put up to cover the note resulting from the check kite as off-setting any loss Cosmopolitan may have suffered. The cross-collateralization agreement gave the bank full rights to apply the proceeds from the Waltzing Matilda sale to his other outstanding loans. Indeed, Cosmopolitan might not have made any new loans to Mau without the cross-collateralization agreement. Moreover, had Mau not exacted a "loan" from Cosmopolitan on his own terms by kiting checks, Cosmopolitan would have been able to sue Mau for the balance due on his other defaulted notes and obtain a judgment whose satisfaction would have required liquidation of the Waltzing Matilda property. Finally, there is no question that the $66,862 owed to Cosmopolitan shortly before Mau defaulted on his loans was not the product of legitimate loans or other conduct. As we noted in *Holiusa*, "unrealized plans to repay do not reduce the loss amount." 13 F.3d at 1046.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.