**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert A. SAUNDERS, Defendant–
Appellant.**

No. 97–1098.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 11, 1997.

Decided Nov. 18, 1997.

Lawrence S. Beaumont (argued), Office of the U.S. Atty., Urbana, IL, for Plaintiff-Appellee.

Ellen Schanzle–Haskins (argued), Lipski & Schanzle–Haskins, Springfield, IL, for Defendant–Appellant

Before FLAUM, RIPPLE and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge.

On May 9, 1996, Robert A. Saunders was indicted on three counts of mail fraud. He eventually pleaded guilty to two counts; the third was dismissed by agreement of the parties. Mr. Saunders now appeals the district court's determination of his sentence. He claims that the district court erred in adding an enhancement of five levels based on the amount of the loss. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.

Mr. Saunders began his career in the investment and insurance businesses as an insurance agent for Metropolitan Life ("MetLife") in Decatur, Illinois. While he was with MetLife, Mr. Saunders specialized in selling 401K rollover plans. In the summer of 1995, he left MetLife and started his own business, a sole proprietorship called RAS Financial Companies ("RAS"). After establishing RAS, Mr. Saunders sent a letter to all his clients announcing the new business and offering its services to them. RAS had a brokerage agreement with Guardian Life ("Guardian") and also sold annuities and life and health insurance through other companies. As part of this business, Mr. Saunders planned to specialize, as he had at MetLife, in the rollover of existing 401K plans. Mr. Saunders claimed that, during the time of the offenses, he expected to receive commissions from rollover business he had written for Guardian in the amount of 4% of the gross amount of the 401K transfers.

According to Mr. Saunders, RAS started out doing quite well. During this period of prosperity, Mr. Saunders says that he sold primarily life insurance and investments on behalf of Guardian. However, by the end of July 1995, the life insurance sales slowed, prompting him to focus on 401K rollovers. Mr. Saunders claims that he sold several rollover plans but soon learned that there was a considerable delay in receiving his commissions for those sales. This delay caused RAS to run low on working capital and forced Mr. Saunders to exhaust his personal savings and credit in order to keep his struggling business afloat.

In the hope of saving his business, Mr. Saunders began to look for other sources of income and, after doing some research, discovered that he could sell debenture bonds that did not require full financial disclosure. Mr. Saunders says that he understood debenture bonds to be personal loans to him from investors, guaranteed by both his business and personal assets. Convinced that

this was the way to save RAS, Mr. Saunders decided to sell $50,000 worth of bonds. Mr. Saunders claims that he limited the sale to $50,000 because he believed that the commissions he was owed from 401K rollovers would be sufficient to repay the bonds upon maturity. He decided that the bonds would be repayable at 9.5% interest and due to be repaid on December 31, 1996. However, he included a statement in the bond offering allowing him to call the bonds early and to repay them before the maturation date in order to cancel the debt.

In the later months of 1995, Mr. Saunders succeeded in finding several individuals willing to "invest" in RAS by purchasing the bonds. The first individual to purchase these bonds from Mr. Saunders was 79 year-old Rhoda Best. Best purchased bonds totaling $5,000 from Mr. Saunders in September and November of 1995. Next, in December of 1995, Mr. Saunders sold bonds to Carol Iler totaling $25,000, to Helen and Aubrey Kingston totaling $10,000, and to Arthur Douglas totaling $5,000. In inducing these individuals to buy the bonds, Mr. Saunders made false statements concerning how the money would be used. He told the investors that the money would be used to finance the construction of a new facility to house RAS, but instead used the money to pay personal and household expenses. Although he admitted making these misrepresentations, Mr. Saunders maintains that he always intended to repay the bonds with interest on or before December 31, 1996. The government, however, contended that Mr. Saunders never intended to repay the bonds.

Although the government alleges that the "bondholders" were the principal victims of Mr. Saunders' scheme, it was a different investor who first alerted authorities to Mr. Saunders' questionable conduct. This investor was 65 year-old Charles Neathery who had originally invested money with Mr. Saunders when he was a representative of MetLife. On August 14, 1995, Mr. Saunders contacted Neathery to inform him that he had started his own business, RAS, and to encourage him to invest in the Guardian Park Avenue Fund. Neathery trusted Mr. Saunders and on August 16, 1995, transferred $10,571.74 from his MetLife account to RAS in the form of a check. These funds were to be invested in the Guardian Park Avenue Fund.[1]

In September 1995, Neathery contacted Mr. Saunders to check on the status of his account. Mr. Saunders told Neathery that this kind of investment took time and that Neathery would hear something soon. Neathery contacted Mr. Saunders several more times and got the same response. He then became suspicious and contacted Guardian. He learned that it had no account in his name. On December 4, 1995, Neathery contacted the Piatt County State's Attorney concerning this investment. Later that same day, Neathery was interviewed by Deputy Manint of the Piatt County Sheriff's office. Neathery informed the officer of the circumstances concerning his investment with Mr. Saunders.

On December 8, 1995, Deputy Manint spoke with Mr. Saunders at the RAS office in Decatur. Mr. Saunders told Deputy Manint that his secretary had deposited Neathery's money in the wrong account and that he was in the process of correcting that mistake. When Deputy Manint asked to speak to the secretary, Mr. Saunders said that he had fired her and would not provide her name. He assured Deputy Manint that Neathery would hear from him shortly and that Neathery would have a choice of reinvesting the funds in the Guardian Park Avenue portfolio or receiving a full refund with interest. On December 22, 1995, Neathery received a full refund plus interest in a check totaling $10,923. Investigators later learned that Mr. Saunders had deposited the money in various personal accounts and had used it to pay personal and household expenses.

During this period, two other agencies became involved in the investigation of Mr. Saunders: the Illinois Secretary of State Securities Division ("SOSSD") and the United States Postal Inspector Service ("USPIS").

---

1. This transaction involving Neathery will be referred to as "the Neathery transaction" in the remainder of this opinion.

On January 9, 1996, USPIS and SOSSD investigators executed a federal search warrant at RAS's office and seized numerous business records. Mr. Saunders was present during the search and agreed to speak with investigators. When questioned about the Neathery transaction, Mr. Saunders repeated the story he had told Deputy Manint. However, after the investigators pointed out several discrepancies in his story, Mr. Saunders indicated that he wished to tell the truth. He acknowledged that he never had a secretary and that he had never invested any of Neathery's funds, but instead had deposited those funds in his personal checking and saving accounts and had taken the remainder out in cash. He further acknowledged that he had encouraged Carol Iler to invest with RAS in order to pay Neathery back and that he had in fact paid Neathery back with money given to him by Iler.

After the execution of the search warrant, Mr. Saunders claims that his goal was reimbursing the investors in order to alleviate their concerns about their investments. He maintains that he and his wife discussed liquidating all their assets in order to pay the investors. However, Mr. Saunders and his wife eventually decided that the quickest way to repay the investors was to borrow the money from Mr. Saunders' father. Then, on February 8, 1996, Mr. Saunders put the borrowed money in his attorney's trust account with instructions to repay the bonds with 9.5% interest. Checks repaying the investors with interest were distributed on March 29, 1996 through Mr. Saunders' attorney.

On May 9, 1996, Mr. Saunders was indicted on three counts of mail fraud. The indictment alleged that, on three occasions, Mr. Saunders used the mails in furtherance of the scheme described above. Mr. Saunders later entered into an unwritten plea agreement with the government in which he agreed to plead guilty to two of the counts in exchange for the dismissal of the remaining count.

### B.

Mr. Saunders was sentenced on January 6, 1997. In the presentence report ("PSR"), the probation officer concluded that Mr. Saunders was responsible for a total loss of $55,514.74 (the total amount of money "invested" by both the bondholders and Neathery). Thus, the probation officer concluded that, pursuant United States Sentencing Guideline § 2F1.1(b)(1)(F), Mr. Saunders' base guideline offense level of six should be enhanced by five levels. In addition, the probation officer recommended a two-level enhancement pursuant to U.S.S.G. § 2F1.1(b)(2) because Mr. Saunders' offense involved both more than minimal planning and a scheme to defraud more than one victim. The probation officer further recommended a two-level enhancement pursuant to U.S.S.G. § 3B1.3 because Mr. Saunders abused a position of private trust in the execution of his scheme. Finally, the probation officer recommended a two-level reduction due to Mr. Saunders' acceptance of responsibility. Thus, the probation officer recommended an adjusted offense level of 13. Combined with the fact that Mr. Saunders had no prior criminal history, this recommendation, if accepted by the court, would have resulted in a sentencing range of 12 to 18 months including at least one year of actual imprisonment.

Mr. Saunders objected to the probation officer's recommendations. He reiterated his claim that he had always intended to repay the investors. He also argued that his actions did not result in any loss to the investors because he had paid them back with interest. In addition, he claimed that he always had sufficient assets to pay the investors back and that he was owed commissions for some 401K rollovers he had sold. In reply, the government argued that Mr. Saunders did not have sufficient assets to pay back the investors without the help of his father and that Mr. Saunders was not owed 401K rollover commissions. The probation officer, in his response to Mr. Saunders' objections to the PSR, also argued that Mr. Saunders did not have the means to pay back the investors on his own and questioned whether Mr. Saunders ever had intended to liquidate his personal assets to pay back the bonds. Moreover, at the sentencing hearing, Postal Inspector Rod Damery testified that he had contacted both Guardian and MetLife

and that both had denied owing Mr. Saunders commissions from 401K rollovers.

The district court concluded that Mr. Saunders was engaged in a "Ponzi scheme" in which he paid one victim back with money obtained from another victim through fraudulent means. The district court further found that Mr. Saunders had no intention of paying back the bondholders because he had no ability to repay the victims without outside help. Moreover, the court found Mr. Saunders' claim of sufficient assets to be unsubstantiated and unverified. It also found that he was not owed 401K rollover commissions as he claimed. Based on these findings, the court concluded that, if Mr. Saunders' father had not bailed him out, the victims would have lost the full amount of their investment. Thus, the court agreed with the probation officer's determination that Mr. Saunders was responsible for a loss of $55,514.74.

The court also accepted the probation officer's other recommendations with the exception of the two-level enhancement for the abuse of a position of private trust. The court's findings resulted in an adjusted offense level of 11. After this determination was made by the court, Mr. Saunders moved for a downward departure pursuant to Application Note 7(b) of U.S.S.G. § 2F1.1 on the ground that the amount of loss overstates the seriousness of the offense. The court denied that motion. The court then sentenced Mr. Saunders to four months in prison to be followed by a term of three years of supervised release, the first four months of which would be served as home detention. In addition, the court ordered Mr. Saunders to pay a fine of $2,000. Mr. Saunders now appeals the district court's determination of his sentence.

## II

## DISCUSSION

■ In this appeal, Mr. Saunders submits that the district court erred in its determination of his sentence under the guidelines. His primary contention is that the district court erred by holding him responsible for a loss of $55,514.74 pursuant to U.S.S.G.

§ 2F1.1(b)(1)(F). We begin our analysis by noting that the standards which govern our review of sentencing matters are well established. We review the district court's findings of fact for clear error. Interpretations of the sentencing guidelines are questions of law, however, and our review is de novo. *See United States v. Cobblah,* 118 F.3d 549, 550 (7th Cir.1997). Accordingly, in this case, the district court's determination of the amount of loss will not be disturbed unless clearly erroneous. *See United States v. Chevalier,* 1 F.3d 581, 585 (7th Cir.1993). However, the meaning of "loss" in U.S.S.G. § 2F1.1(b)(1) is a legal question which we shall review de novo. *Id.*

### A.

The district court held Mr. Saunders responsible for a total loss of $55,514.74. This total included both the full amount of the bondholders' investments and the Neathery transaction. Mr. Saunders contends that the district court erred in holding him responsible for any loss in association with either scheme. We shall first address Mr. Saunders' argument concerning the amount of loss suffered by the bondholders. After that discussion, we shall turn to the question of whether Mr. Saunders should be held responsible for any loss associated with the Neathery transaction.

### 1. *Loss to the Bondholders*

Under § 2F1.1(b)(1) of the guidelines, the base offense level of a defendant in a fraud case will be enhanced according to the amount of loss he has inflicted on the victims of his crime. Application Note 7 sets forth different methods of calculating the amount of loss for different kinds of fraudulent activity. When the fraud is tantamount to a simple theft, Application Note 7 provides that loss is to be calculated according to the method described in the theft guideline, § 2B1.1. U.S.S.G. § 2F1.1, comment. (n.7). When the fraud is not tantamount to simple theft, Application Note 7 prescribes a different method for calculating loss. Such cases include, among others, those involving fraudulent loan applications. *See* U.S.S.G. § 2F1.1, comment. (n.7(b)). In these cases, loss is

calculated to take into account, at the time of discovery, the actual loss to the victim, reduced by the assets that the defendant had pledged to secure the loan and that can be expected to be used in satisfaction of the loss. Id. However, in all fraud cases, Application Note 7 requires district courts to increase a defendant's offense level based on the greater value of either the actual loss suffered by the victims of the fraud or the intended or probable loss which the defendant attempted to inflict on the victims.

█ Mr. Saunders characterizes this case as analogous to a fraudulent loan application case. With respect to actual loss, Mr. Saunders asserts that the victims suffered no actual loss because, at the time of sentencing, he had paid back all those whom the government claims he was attempting to swindle. With respect to intended loss, Mr. Saunders argues that the government failed to prove by a preponderance of the evidence that he intended any loss to the victims. Indeed, he maintains that, from the beginning of the investigation until the time of sentencing, he has consistently maintained that he intended to pay the investors back as promised and that the government has failed to present any evidence to the contrary. Thus, he argues that, under the guidelines, he should not be held responsible for any loss, and accordingly, his base level offense should not be enhanced. In the alternative, Mr. Saunders contends that the district court erred by not subtracting from the total amount of the bonds the value of the assets he had pledged to secure those bonds.[2]

We cannot accept Mr. Saunders' characterization of this case. The district court found that Mr. Saunders had no intention of paying the bondholders back. The court based this determination primarily on evidence showing that Mr. Saunders did not have the ability to pay the bondholders back. The record supports the district court's conclusion. The probation officer specifically found that Mr. Saunders did not have the means to pay back the investors without the help of his father and that Mr. Saunders' claims of assets were illusory and speculative. Specifically, the probation officer found that the net worth statement submitted by Mr. Saunders did not take into account a $20,000 loan he had undertaken on October 11, 1995. In addition, the probation officer noted that Mr. Saunders' net worth statement showed assets of $92,825 in household furnishings and possessions; the valuation of these assets, which supposedly included several antiques inherited by his wife, was not based on an independent appraisal but on Mr. Saunders' own estimate of their value. Moreover, because he ultimately turned to his father for a loan rather than liquidating any of his own assets, the probation officer concluded that Mr. Saunders never intended to liquidate those assets he did have to pay back the bonds. Finally, at the sentencing hearing, Postal Inspector Rod Damery testified that he had contacted both Guardian and MetLife and both had denied owing Mr. Saunders commissions from 401K rollovers. In light of this record, the district court's conclusion that Mr. Saunders never intended to repay the bondholders is not clearly erroneous.[3]

Because the district court's finding that Mr. Saunders did not intend to repay the bondholders is not clearly erroneous, it is clear that this case is properly characterized as a case of simple theft. Mr. Saunders simply took the bondholders' money and never intended to return it. As we have noted, in this type of case, Application Note 7 of § 2F1.1 directs the district court to calculate loss according to the method described in the theft guideline, § 2B1.1. Application Note 2 to § 2B1.1 defines loss as "the value of the property taken." Application Note 2 further provides that, even if the property or the full

---

**2.** Specifically, Mr. Saunders claims that, at the time he started to sell bonds, he had a net worth of $30,091. He claims that this estimate took into account the full amount of his liability to Neathery ($10,571.74) and $3,000 worth of his liability to Best. Thus, he argues that his net worth should be subtracted from the amount of the investments not included in his net worth statement as liabilities ($42,000).

**3.** Moreover, in light of the fact that Mr. Saunders had lied to the bondholders, Neathery, Deputy Manint, and the USPIS and SOSSD investigators, the district court was justified in its choice not to give credence to Mr. Saunders' claim that he had always intended to repay the bondholders as promised.

value thereof is recovered, the amount of loss remains the value taken. In addition, Application Note 7 of § 2F1.1 provides that the defendant should be sentenced according to the loss he intended to inflict if it is greater than the actual loss suffered by the victims.

■ We begin, therefore, by calculating the actual loss suffered by the victims, turning to intended loss only if it is greater than actual loss. We have established that, in fraud cases such as this one, when the fraud is equivalent to simple theft, actual loss is measured at the time the fraud is detected. *See United States v. Mau*, 45 F.3d 212, 216 (7th Cir.1995). In addition, we have stated that a defendant cannot reduce the amount of loss for sentencing purposes by offering to make restitution after he is caught. *See id.*; *United States v. Mummert*, 34 F.3d 201, 204 (3d Cir.1994) ("A defendant in a fraud case should not be able to reduce the amount of loss for sentencing purposes by offering to make restitution after being caught."). In this case, the fraud was detected when the USPIS and the SOSSD executed the search warrant at Mr. Saunders' office. At that point, the bondholders were out the full amount of their investment, $45,000. Thus, at the point the fraud was detected, the actual loss to the bondholders was $45,000. Because the actual loss is the full amount of the bondholders' investments, we need not calculate intended loss in this case. Moreover, the fact that Mr. Saunders later made restitution to the victims of his crime is irrelevant. Therefore, the district court correctly held Mr. Saunders responsible for a loss of $45,000 in connection with his scheme to defraud the bondholders.

■ Even if we were to accept Mr. Saunders' characterization and to treat this as a loan case, we would reach the same result. In a fraudulent loan case, loss is calculated according to the method provided in Application Note 7(b) to § 2F1.1. Application Note 7(b) is intended to focus on the amount of unwarranted risk to which the victim has been exposed as a result of the fraud perpetuated by the defendant. Specifically, Application Note 7(b) provides that actual loss in a fraudulent loan case is "the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan." U.S.S.G. § 2F1.1, comment. (n.7(b)). Consistent with this directive, our cases indicate that, at sentencing, the trial judge should determine how much of that collateral has been realized or can be expected to be realized and should deduct that amount from the amount of loss. *See United States v. Johnson*, 16 F.3d 166, 171 (7th Cir.1994); *United States v. Chevalier*, 1 F.3d 581, 585–86 (7th Cir.1993).[4] However, as in theft cases, "where the intended loss is greater than actual loss, the intended loss is to be used." U.S.S.G. § 2F1.1, comment. (n.7(b)).

In this case, Mr. Saunders claims that, at the time he started to sell the bonds, he had a net worth of $30,091. He contends that, because he pledged his entire net worth on the bonds, the district court should have reduced its loss calculation by this amount.

---

4. Mr. Saunders relies on these cases to advance his argument that the bondholders suffered no actual loss because, at the time of sentencing, he had repaid them with interest. This argument misapprehends both Application Note 7(b)'s formula for calculating loss and our case law interpreting that formula. As noted above, Application Note 7(b) defines actual loss in a fraudulent loan application case to be "the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan." U.S.S.G. § 2F1.1, comment. (n.7(b)). Consistent with this formula, we have held that district courts should reduce the actual loss determined at the time of detection by the amount of collateral that has been realized or can be expected to be realized at the time of sentencing. *Johnson*, 16 F.3d at 171. Our cases have made it clear, however, that district courts should offset the amount of the loan only by the value of the collateral the bank has or expects to gain at the time the fraud is discovered. *United States v. Mau*, 45 F.3d 212, 216 (7th Cir.1995). Thus, even in the fraudulent loan context, the district court cannot reduce the amount of actual loss because the defendant makes restitution after his scheme has been exposed. *Id.* In this case, therefore, the fact that Mr. Saunders paid restitution after being caught would not reduce his sentence even if we were to accept his characterization of this case.

The district court, however, found that Mr. Saunders' claim of a net worth in this amount was unsubstantiated and unverified. Indeed, the record appears to support the conclusion that Mr. Saunders did not have a net worth of $30,091. Nonetheless, there is some evidence which suggests that Mr. Saunders may have had some assets available to pay back a portion of what he owed the bondholders.[5] We need not determine the exact amount of Mr. Saunders' assets, however, because the district court specifically found that Mr. Saunders intended to cause a loss in the full amount of the bondholders' investments, $45,000. Thus, even if the actual loss to the bondholders was less than that amount, Application Note 7(b) makes it clear that, whenever the intended loss is greater than the actual loss, the defendant's sentence is to be based on the intended loss. U.S.S.G. § 2F1.1, comment. (n.7(b)). In the end, therefore, it does not matter whether we characterize this case as a simple theft or a fraudulent loan; in either event, the district court correctly held Mr. Saunders responsible for a loss of $45,000 in connection with his scheme to defraud the bondholders.

### 2. The Neathery Transaction

■ We turn next to Mr. Saunders' contention that the district court erred by including the $10,571.74 involved in the Neathery transaction in its calculation of the amount of loss. He argues that the Neathery transaction should not have been included in the amount of loss because it was not related to the scheme involving the bondholders. Moreover, he continues, even if it was part of that scheme, the amount should not have been included because he paid Neathery back before the entire scheme was exposed. See United States v. Holiusa, 13 F.3d 1043, 1046 (7th Cir.1994). The government, maintaining that the Neathery transaction and the scheme to defraud the bondholders were part of the same "Ponzi scheme," now agrees that the amount of the Neathery transaction should not have been included in

the amount of loss because Mr. Saunders had repaid Neathery before detection of the entire scheme.[6]

We shall assume for the sake of argument that the government's acknowledgment of error is well founded and that, under § 2F1.1(b)(1), the money Mr. Saunders returned to Neathery prior to the detection of his entire scheme should not have been included in the amount of loss. Nevertheless, even if the Neathery transaction is excluded from the calculation, Mr. Saunders' base level offense still would be increased by five levels because Mr. Saunders is responsible for a loss in excess of $40,000 based solely on his scheme to defraud the bondholders. See U.S.S.G. § 2F1.1(b)(1)(F). Thus, the inclusion of the loss for the Neathery transaction did not affect the guideline range for determining his sentence.

■ Nonetheless, once we have concluded that the district court has misapplied the guidelines, a remand is necessary unless we conclude, on the record as a whole, that the error was harmless because it did not affect the district court's selection of the sentence imposed. See Williams v. United States, 503 U.S. 193, 203, 112 S.Ct. 1112, 1120, 117 L.Ed.2d 341 (1992). Applying this standard, we previously have held that a district court's miscalculation of the amount of loss is harmless error if it does not affect the guideline range. See United States v. Coffman, 94 F.3d 330, 337 (7th Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 1426, 137 L.Ed.2d 535 (1997). In this case, the district court's error as to the amount of loss also does not affect the guideline range within which Mr. Saunders was sentenced. We note, moreover, that the district court imposed the minimum sentence within the applicable guideline range in all respects except for the term of supervised release. With respect to that part of the sentence, the court ordered a three-year term of supervised release. The minimum term of supervised release for Mr. Saunders' offense, a class D felony, is two years. See U.S.S.G. § 5D1.2(a)(2). On con-

---

5. At oral argument, Mr. Saunders' counsel informed the court that, a month prior to sentencing, Mr. Saunders had sold his house and realized a profit of approximately $11,000.

6. The government did not advise the district court that the Neathery transaction ought to be excluded from the calculation of loss.

sideration of the record as a whole, however, we conclude that district court's inclusion of the Neathery transaction did not affect its choice of a term of supervised release and therefore the district court's decision to include the Neathery transaction in its loss calculation was harmless error.

### 3. *Total Loss*

In light of our analysis in the foregoing subsections, we find that the district court correctly enhanced the defendant's base level offense by five levels based on the fact that his fraud caused a loss in excess of $40,000. *See* U.S.S.G. § 2F1.1(b)(1)(F).

### B.

■ Mr. Saunders' final contention is that the district court erred in denying his request for a downward departure from the applicable guidelines range pursuant to Application Note 7(b) of § 2F1.1. Application Note 7(b) allows a district court to depart downward from the applicable guidelines range if it determines that the amount of loss overstates the seriousness of the offense. *See* U.S.S.G. § 2F1.1, comment. (n.7(b)). The decision of a district court to deny a downward departure is a discretionary decision not subject to the review of this court. *See United States v. Morris,* 80 F.3d 1151, 1174 (7th Cir.), *cert. denied,* — U.S. —, 117 S.Ct. 181, 136 L.Ed.2d 120 (1996). Therefore, we cannot review the district court's decision to deny a downward departure in this case.

### Conclusion

For the foregoing reasons, we affirm the decision of the district court.

AFFIRMED.